DR:ML/BW
F. #2022R00580

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

SHLOMO PATCHIAV,
       also known as "Slava Fatkhiev,"

           Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

23-CR-99 (DLI)

MEMORANDUM OF LAW IN SUPPORT OF
THE GOVERNMENT'S MOTIONS IN LIMINE

JOSEPH NOCELLA, JR.
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Megan Larkin
Benjamin Weintraub
Assistant U.S. Attorneys
      (Of Counsel)

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................... 1

RELEVANT BACKGROUND ...................................................................................... 2

I.   Offense Conduct ............................................................................................... 2

II.  The Defendant's Arrest, Charges and the Court's Suppression Ruling............................. 7

ARGUMENT ......................................................................................................... 9

I.   Evidence of the Victim's Disappearance, Murder and the Recovery of His Body is
     Admissible ......................................................................................................... 9

     A. Applicable Law .......................................................................................... 9

        1. Direct Evidence .................................................................................... 9

        2. Federal Rule of Evidence 404(b)................................................................ 10

     B. Discussion................................................................................................. 11

        1. Direct Evidence .................................................................................... 11

        2. Federal Rule of Evidence 404(b)................................................................ 16

        3. Federal Rule of Evidence 403.................................................................... 18

II.  Photographic Evidence of Crime Scene and Autopsy is Admissible ............................... 19

III. Statements of the Defendant, CC-1 and the Victim Introduced By the Government Are
     Admissible ......................................................................................................... 20

     A. Applicable Law .......................................................................................... 21

        1. The Defendant's Statements...................................................................... 21

        2. CC-1's Statements in Furtherance of the Conspiracy ....................................... 21

        3. CC-1's Statements Against Penal Interest..................................................... 24

        4. The Victim's Statements.......................................................................... 26

     B. Discussion................................................................................................. 27

        1. The Defendant's Statements Are Admissible.................................................. 27

    2.   Statements by CC-1 Are Admissible as Co-Conspirator Statements ............. 27

    3.   CC-1's Statements are Admissible as Statements Against Penal Interest....... 28

    4.   The Victim's Statements are Admissible ....................................................... 30

    5.   Additional Portions of the Defendant's Statements Are Inadmissible If Offered by the Defendant ............................................................................................. 31

IV. Certified Business and Public Records Are Admissible.................................................. 34

V.  The Government Should Be Permitted to Introduce, on Cross-Examination of the Defendant, Evidence Otherwise Suppressed for Impeachment Purposes ....................... 37

VI. The Defendant Should Be Precluded From Questioning, Arguing or Asserting That His Arrest was Unlawful or Referencing the Court's Suppression of Evidence .................... 39

VII. The Court Should Preclude Any Evidence Introduced by the Defendant Seeking to Elicit Sympathy ................................................................................................................... 40

VIII. The Court Should Preclude Any Evidence or Arguments Regarding the Government's Charging Decisions ..................................................................................................... 42

IX. The Court Should Preclude Any Evidence Relating to Possible Punishment and Collateral Consequences ............................................................................................................ 44

X.  The Defendant Must Disclose Witness Statements Under Fed. R. Crim. P. 26.2 ......... 45

CONCLUSION.................................................................................................................. 47

TABLE OF AUTHORITIES

CASES

Bourjaily v. United States,
  483 U.S. 171 (1987) ................................................................................................. 22

Funk v. Belneftekhim,
  No. 14-CV-0376 (BMC), 2018 WL 11169575 (E.D.N.Y. Nov. 30, 2018) ............................. 32

Melendez-Diaz v. Massachusetts,
  557 U.S. 305 (2009) ............................................................................................. 36, 37

Old Chief v. United States,
  519 U.S. 172 (1997) .......................................................................................... 10, 13, 21

Payton v. New York,
  445 U.S. 573 (1980) .................................................................................................. 8

Shannon v. United States,
  512 U.S. 573 (1994) ............................................................................................. 44, 45

United States v. Amato,
  15 F.3d 230 (2d Cir. 1994) ......................................................................................... 24

United States v. Amato,
  No. 03-CR-1382 (NGG), 2006 WL 1788190 (E.D.N.Y. June 26, 2006) ............................... 32

United States v. Battaglia,
  No. 05-CR-774 (KMW), 2008 WL 144826 (S.D.N.Y. Jan. 15, 2008) .................................. 40

United States v. Bein,
  728 F.2d 107 (2d Cir. 1984) ....................................................................................... 13

United States v. Blake,
  195 F. Supp. 3d 605 (S.D.N.Y. 2016) ........................................................................... 30

United States v. Blume,
  967 F.2d 45 (2d Cir. 1992) ......................................................................................... 44

United States v. Boyle,
  No. 08-CR-523 (CM), 2009 WL 5178525 (S.D.N.Y. Dec. 23, 2009) .................................. 42

United States v. Carboni,
  204 F.3d 39 (2d Cir. 2000) ...................................................................................... 9, 13, 16

United States v. Cardascia,
  951 F.2d 474 (2d Cir. 1991) ....................................................................................... 31

United States v. Carneglia,
    No. 08-CR-76 (JBW), 2009 WL 185725 (E.D.N.Y. Jan. 27, 2009)........................................ 42

United States v. Cherry,
    217 F.3d 811 (10th Cir. 2000) ................................................................... 15, 25, 30

United States v. Chester,
    No. 13-CR-774, 2017 WL 3394746 (N.D. Ill. Aug. 8, 2017).................................................. 25

United States v. Colon,
    880 F.2d 650 (2d Cir. 1989).................................................................................. 11

United States v. Coonan,
    938 F.2d 1553 (2d Cir. 1991)................................................................................ 10

United States v. Dhinsa,
    243 F.3d 635 (2d Cir. 2001)................................................................................. 24

United States v. DiMarzo,
    80 F.3d 656 (1st Cir. 1996)................................................................................. 44

United States v. Dinkins,
    691 F.3d 358 (4th Cir. 2012) ............................................................................... 25

United States v. Djibo,
    No. 15-CR-88 (RJD), 2019 WL 3767045 (E.D.N.Y. Aug. 9, 2019) ........................................ 37

United States v. Douglas,
    525 F.3d 225 (2d Cir. 2008)............................................................................. 36, 37

United States v. Dupree,
    870 F.3d 62 (2d Cir. 2017)................................................................................. 23

United States v. Eisen,
    974 F.2d 246 (2d Cir. 1992)................................................................................ 22

United States v. Ellis,
    460 F.3d 920 (7th Cir. 2006) ............................................................................... 34

United States v. Garcia,
    291 F.3d 127 (2d Cir. 2002)................................................................................ 11

United States v. Gigante,
    166 F.3d 75 (2d Cir. 1998)............................................................................. 20, 21

United States v. Gonzalez,
    110 F.3d 936 (2d Cir. 1997)........................................................................... 9, 10, 15

United States v. Gonzalez,
    399 F. App'x 641 (2d Cir. 2010) ............................................................... 32

United States v. Gotti,
    457 F. Supp. 2d 395 (S.D.N.Y. 2006).................................................... 31

United States v. Gupta,
    747 F.3d 111 (2d Cir. 2014).................................................................... 23

United States v. Harper,
    No. 05-CR-6068 (DGL), 2009 WL 140125 (W.D.N.Y. Jan. 20, 2009) ................. 31

United States v. Harris,
    491 F.3d 440 (D.C. Cir. 2007) ................................................................. 40

United States v. Havens,
    446 U.S. 620 (1980)............................................................................ 36, 37

United States v. Helbrans,
    No. 19-CR-497 (NSR), 2021 WL 4778525 (S.D.N.Y. Oct. 12, 2021)............... 22, 23

United States v. Hill,
    No. 12-CR-214 (KAM), 2014 WL 198813 (E.D.N.Y. Jan. 14, 2014) .................... 42

United States v. Inniss,
    No. 18-CR-134 (KAM), 2019 WL 6999912 (E.D.N.Y. Dec. 20, 2019) ............ 10, 42

United States v. Inserra,
    34 F.3d 83 (2d Cir. 1994) ................................................................. 9, 15, 16

United States v. Jackson,
    180 F.3d 55 (2d Cir. 1999)...................................................................... 32

United States v. James,
    No. 02-CR-778 (SJ), 2007 WL 2702452 (E.D.N.Y. Sept. 12, 2007) ..................... 33

United States v. Jefferson,
    215 F.3d 820 (8th Cir. 2000) ................................................................... 21

United States v. Johnson,
    507 F.3d 793 (2d. Cir. 2007)................................................................... 32

United States v. Johnson,
    688 F.3d 494 (8th Cir. 2012) ................................................................... 34

United States v. Kahale,
    789 F. Supp. 2d 359 (E.D.N.Y. 2009) ...................................................... 22

United States v. Kirk Tang Yuk,
    885 F.3d 57 (2d Cir. 2018) ................................................................. 13

United States v. Komasa,
    767 F.3d 151 (2d Cir. 2014) ............................................................... 35

United States v. Kone,
    216 F. App'x 74 (2d Cir. 2007) ......................................................... 20

United States v. Kurland,
    No. 20-CR-306 (S-1) (NGG), 2022 WL 2669897 (E.D.N.Y. July 11, 2022) ......................... 20

United States v. Levy,
    731 F.2d 997 (2d Cir. 1984) ............................................................... 11

United States v. Lewis,
    110 F.3d 417 (7th Cir. 1997) .............................................................. 44

United States v. Mahaffy,
    No. 05-CR-613 (ILG), 2007 WL 1094153 (E.D.N.Y. Apr. 10, 2007) .................................... 30

United States v. Malka,
    602 F. Supp. 3d 510 (S.D.N.Y. 2022) ......................................... 20, 21, 24

United States v. Malpeso,
    115 F.3d 155 (2d Cir. 1997) ............................................................... 41

United States v. Marin,
    669 F.2d 73 (2d Cir. 1982) ................................................................ 30

United States v. Martino,
    759 F.2d 998 (2d Cir. 1985) ........................................................... 18, 19

United States v. Mastropieri,
    685 F.2d 776 (2d Cir. 1982) ............................................................... 13

United States v. McDaniel,
    398 F.3d 540 (6th Cir. 2005) .............................................................. 31

United States v. Mermelstein,
    487 F. Supp. 2d 242 (E.D.N.Y. 2007) ................................................. 22

United States v. Michel,
    879 F. Supp. 2d 291 (E.D.N.Y. 2012) ................................................. 35

United States v. Mickens,
    926 F.2d 1323 (2d Cir. 1991) ......................................................... 11, 12

United States v. Miller,
 641 F. Supp. 2d 161 (E.D.N.Y. 2009) ....................................................... 40

United States v. Morgan,
 505 F.3d 332 (5th Cir. 2007) ................................................................... 34

United States v. Napout,
 No. 15-CR-252 (PKC), 2017 WL 6375729 (E.D.N.Y. Dec. 12, 2017) .................. 45

United States v. Neumann,
 No. 21-CR-439 (NSR), 2023 WL 8700974 (S.D.N.Y Dec. 14, 2023) .................... 21

United States v. Ortiz,
 857 F.2d 900 (2d Cir. 1988) .................................................................... 11

United States v. Paccione,
 949 F.2d 1183 (2d Cir. 1991) .................................................................. 40

United States v. Pascarella,
 84 F.3d 61 (2d Cir. 1996) ................................................................. 10, 15

United States v. Perez,
 387 F.3d 201 (2d Cir. 2004) .................................................................. 12

United States v. Persico,
 645 F.3d 85 (2d Cir. 2011) .................................................................... 23

United States v. Persico,
 No. 04-CR-911 (SJ), 2006 WL 3246922 (E.D.N.Y. Nov. 8, 2006) ....................... 33

United States v. Pitre,
 960 F.2d 1112 (2d Cir. 1992) .................................................................. 11

United States v. Qualls,
 613 F. App'x 25 (2d Cir. 2015) ........................................................... 34, 35

United States v. Rahme,
 813 F.2d 31 (2d Cir. 1987) .................................................................... 21

United States v. Rivera,
 22 F.3d 430 (2d Cir. 1994) .................................................................... 20

United States v. Robinson,
 702 F.3d 22 (2d Cir. 2012) ..................................................................... 9

United States v. Rom,
 528 F. App'x 24 (2d Cir. 2013) ............................................................... 35

United States v. Russo,
    302 F.3d 37 (2d Cir. 2002)............................................................................ 21

United States v. Saget,
    377 F.3d 223 (2d Cir. 2004).......................................................................... 24

United States v. Salameh,
    152 F.3d 88 (2d Cir. 1998)............................................................................ 15

United States v. Salerno,
    868 F.2d 524 (2d Cir. 1987).......................................................................... 21

United States v. Salim,
    189 F. Supp. 2d 93 (S.D.N.Y. 2002)............................................................ 17

United States v. Santiago,
    199 F. Supp. 2d 101 (S.D.N.Y. 2002)..................................................... 18, 19

United States v. Sasso,
    59 F.3d 341 (2d Cir. 1995)............................................................................ 24

United States v. Schlesinger,
    372 F. Supp. 711 (E.D.N.Y. 2005) ............................................................... 21

United States v. Shyne,
    No. 05-CR-1067 (KMK), 2007 WL 1075035 (S.D.N.Y. Apr. 5, 2007)................................. 19

United States v. Steele,
    390 F. App'x 6 (2d Cir. 2010) ...................................................................... 15

United States v. Stewart,
    433 F.3d 273 (2d Cir. 2006).......................................................................... 21

United States v. Stewart,
    485 F.3d 666 (2d Cir. 2007).......................................................................... 24

United States v. Stewart,
    No. 03-CR-717 (MGC), 2004 WL 113506 (S.D.N.Y. Jan. 26, 2004)..................................... 42

United States v. Tan,
    No. 21-CV-126, 2022 WL 15522231 (E.D. La. Oct. 27, 2022) ............................................ 23

United States v. Taylor,
    767 F. Supp. 2d 428 (S.D.N.Y. 2010)........................................................... 10

United States v. Terry,
    702 F.2d 299 (2d Cir. 1983).......................................................................... 32

United States v. Thai,
  29 F.3d 785 (2d Cir. 1994) .................................................................... 9

United States v. Thomas,
  116 F.3d 606 (2d Cir. 1997) ............................................................ 43, 44

United States v. Thompson,
  286 F.3rd 950 (7th Cir. 2002) ............................................................. 25

United States v. Towne,
  870 F.2d 880 (2d Cir. 1989) .................................................................. 9

United States v. Tracy,
  12 F.3d 1186 (2d Cir. 1993) ................................................................ 19

United States v. Tyrell,
  840 F. App'x 617 (2d Cir. 2021) .................................................... 23, 24

United States v. Vidal,
  No. 22-2857-CR, 2024 WL 397630 (2d Cir. Feb. 2, 2024) ..................... 19

United States v. Watts,
  934 F. Supp. 2d 451 (E.D.N.Y. 2013) ................................................. 44

United States v. Weiland,
  420 F.3d 1062 (9th Cir. 2005) ............................................................. 34

United States v. Weingarten,
  No. 19-CR-497 (NSR), 2024 WL 677995 (S.D.N.Y. Feb. 15, 2024) ...... 21

United States v. Wexler,
  522 F.3d 194 (2d Cir. 2008) ................................................................ 24

United States v. Yeley-Davis,
  632 F.3d 673 (10th Cir. 2011) ............................................................. 34

United States v. Yousef,
  327 F.3d 56 (2d Cir. 2003) .................................................................. 30

United States v. Zackson,
  12 F.3d 1128 (2d Cir. 1993) ................................................................ 18

Walder v. United States,
  347 U.S 62 (1954) ............................................................................... 36

Williams v. Vahey,
  No. 20-CV-2560 (KAM), 2023 WL 130834 (E.D.N.Y. Jan. 8, 2023) ...... 45

ix

Yoselovsky v. Associated Press,
   917 F. Supp. 2d. 262 (S.D.N.Y. 2013) ................................................................... 38


## STATUTES

18 U.S.C. § 1951(b)(2) ............................................................................................ 12

28 U.S.C. § 1783 ..................................................................................................... 22

18 U.S.C. § 3500 ..................................................................................................... 45

## RULES

Fed. R. Crim. P. 17(e)(2) ........................................................................................ 22

Fed. R. Crim. P. 26.2 ................................................................................... 1, 44, 45

Fed. R. Evid. 106 .................................................................................................... 31

Fed. R. Evid. 201(b)(2) ........................................................................................... 38

Fed. R. Evid. 401 .............................................................................................. 39, 43

Fed. R. Evid. 401(a) ................................................................................................ 40

Fed. R. Evid. 402 .................................................................................................... 40

Fed. R. Evid. 403 .......................................................................................... 40, 41, 43

Fed. R. Evid. 404(b)(2) ........................................................................................... 11

Fed. R. Evid. 405(a) ................................................................................................ 40

Fed. R. Evid. 801(c) ................................................................................................ 19

Fed. R. Evid. 801(d)(2)(A) ........................................................................... 18, 20, 26

Fed. R. Evid. 801(d)(2)(E) ............................................................................... 19, 33

Fed. R. Evid. 802 .................................................................................................... 19

Fed. R. Evid. 803(3) ................................................................................................ 31

Fed. R. Evid. 803(6) .......................................................................................... 34, 35

Fed. R. Evid. 804(a)(4) ..................................................................................... 24, 29

Fed. R. Evid. 804(a)(5)(B) ...................................................................................... 22

Fed. R. Evid. 804(b)(3)(B) ............................................................................................................. 19

Fed. R. Evid. 804(b)(6) ......................................................................................................... 19, 24

PRELIMINARY STATEMENT

   The defendant Shlomo Patchiav, also known as "Slava Fatkhiev," was charged by a grand jury in this District with Hobbs Act extortion conspiracy, in violation of Title 18, United States Code, 1951(a), arising from the extortion, disappearance and murder of Shehroz Tokhirov ("Tokhirov" or the "Victim").  The government respectfully submits this memorandum of law in support of its motions in limine to permit the government to introduce at trial: (1) evidence of the Victim's disappearance, murder and the recovery of his body; (2) crime scene and autopsy photographs of the Victim; (3) certain statements of the defendant, the defendant's co-conspirator, Sanat Djumayev ("Djumayev" or "CC-1") and the Victim; (4) certified business records and public records, as detailed below; and (5) for impeachment purposes and only if the defendant testifies and opens the door, as described further herein, evidence that has been suppressed.  Because each of these categories of evidence is relevant and admissible under the Federal Rules of Evidence, and because they are not unduly prejudicial, the government should be permitted to introduce them at trial.

   The government also moves to preclude evidence or mention at trial, during jury addresses, cross-examination or otherwise, that: (1) the defendant's arrest was unlawful or referencing the Court's suppression of certain evidence, as detailed below; (2) seeks to elicit sympathy, including evidence of the defendant's good character through specific instances of conduct; (3) references or questions the government's charging decisions; and (4) relates to possible punishment or collateral consequences the defendant may face upon conviction. Finally, the government moves for an order setting a schedule for disclosure of witness statements under Federal Rule of Criminal Procedure 26.2.

   For the reasons set forth herein, the government's motions in limine should be granted.

RELEVANT BACKGROUND[1]

## I.    OFFENSE CONDUCT

The evidence at trial will establish that the defendant and CC-1 engaged in an extortion conspiracy in which they used threats and violence—which escalated into murder—against the Victim related to money owed in a luxury watch deal.  The Victim was last seen by his family on June 25, 2022.

The defendant owned a wholesale jewelry and diamond business in which he sold high end watches and other jewelry to interested businesses.  In 2021, the defendant and CC-1 met and formed a professional relationship in which they discussed potential business opportunities.  On occasion, the defendant would provide a ride or let CC-1 borrow a white Jeep Grand Cherokee (the "Jeep Cherokee") with New York license plate JBR9732, which was registered to the defendant's brother, Markel Fathiev.  CC-1 later introduced the defendant to the Victim, who was from a similar region in Uzbekistan as CC-1, and with whom CC-1 also had a business relationship.  The defendant and the Victim then formed their own business relationship.

Around June 2022, the defendant and CC-1 engaged in discussions with the Victim about the potential sale of several luxury watches for approximately $500,000 (the "watch deal").  In connection with the watch deal, the defendant and CC-1 began demanding money from and threatening the Victim related to an alleged debt that the Victim owed them

---

[1]    The proffer of facts set forth herein does not purport to provide a complete statement of all facts and evidence of which the government is aware or will seek to introduce at trial.  In addition, the proffer of facts set forth in this motion as to any witness's anticipated testimony is a collection of the sum and substance of the witness's anticipated testimony and does not purport to provide a complete statement of all facts and evidence of which the government is aware or will seek to introduce through the respective witness's anticipated testimony.

related to the deal.  For example, the defendant told the Victim, in sum and substance, that the Victim must get the money for the defendant "or else," and that if the Victim failed to do so, the defendant would "hold" the Victim until the debt was fully paid.  According to cell site location data and toll records, throughout the month leading up to the Victim's disappearance, the defendant and CC-1 persistently called the Victim and traveled to the vicinity of the Victim's residence in Kensington, Brooklyn on numerous occasions, where the defendant and CC-1 sometimes stayed for multiple hours.

After days of repeated threats and demands, during the evening of Friday, June 24, 2022, the defendant, CC-1 and the Victim met in person to discuss the watch deal.  The defendant then left to observe Shabbat, which began that evening at 8:13 p.m., and let CC-1 borrow the Jeep Cherokee for the night and next day.  Later that evening, at approximately 8:40 p.m., after the start of Shabbat, CC-1 sent messages to the defendant stating, in sum and substance, that "[h]e wants to register his Mercedes car to me" for $70,000, provide a check for $30,000, and provide "the rest" in cash.  CC-1 asked the defendant what he should do.[2]

The next morning, on Saturday, June 25, 2022, the Victim left his apartment in Brooklyn with a bag of cash.  The Victim's family never saw him again.  Video surveillance footage from that morning showed the Victim and CC-1 at a TD Bank branch in Brooklyn.  He was wearing a reddish-pink t-shirt, dark pants, and dark loafers with white soles.  The Victim withdrew approximately $10,000 in cash and obtained a cashier's check for $20,000 that was made out to CC-1.  The Victim and CC-1 then visited a tax services store located in the vicinity

---

[2]     The government intends to seek to enter into a stipulation with the defendant that Shabbat spanning June 24-25, 2022 began in Brooklyn at 8:13 p.m. EST on Friday, June 24, 2022 and ended at 9:21 p.m. EST on Saturday, June 25, 2022.  Should the defendant decline to stipulate, the government expects to seek judicial notice of this fact pursuant to Fed. R. Evid. 201(b)(2).

of the Victim's apartment in which the Victim signed a document before a notary (the "Notarized Document") which stated the following:

> To whom it may concern, I, Tokhirov Shekhroz giving my vehicle ME/BE 2018 with win# 4JGDF7DE8JB006273 to Djumayez Sanat till 11:59pm June 25, 2022 as a bail[.] Until I repay remaining balance of 70,000.00$; If I don't pay this amount by 11:59pm June 25, 2022; Its mean that I Tokhirov Shekhroz sold car to Djumayev Sanat[.]

At the time, the Victim had a 2018 Mercedes Benz GL5 SUV (the "Mercedes") with New York license plate DONIYOR, and a vehicle identification number matching the number listed in the Notarized Document.

Later that same day, around 3:30 p.m., CC-1 called a car dealership in Huntingdon, Pennsylvania to inquire about purchasing a cheap vehicle. CC-1 then drove the Jeep Cherokee to the dealership and purchased a silver Chevrolet Malibu (the "Chevy Malibu") for $2,500 in cash. CC-1 was with several other individuals at the dealership. During the purchase, CC-1 was told the Chevy Malibu had electrical issues to which CC-1 responded, in sum and substance, that he only needed it for a day to drive to Brooklyn and would return the following week for repairs and to obtain a temporary license plate. No bill of sale or paperwork was completed that day. After the purchase, CC-1 drove the Jeep Cherokee and one of the individuals drove the Chevy Malibu to Brooklyn. The Chevy Malibu was parked in the vicinity of CC-1's residence at 115 Brightwater Court in Brighton Beach, Brooklyn. Upon arriving in Brooklyn, at approximately 8:30 p.m., CC-1 purchased two dark-colored duffle bags from a gift shop in Brighton Beach, Brooklyn. Cell site location data shows CC-1 and Individual-1 in the vicinity of the car dealership around 5:30 to 6:15 p.m., and Individual-1 and Individual-2 in Brighton Beach, Brooklyn—in the vicinity of where the Chevy Malibu was parked—around 8:45 to 9:45 p.m.

4

After Shabbat had ended, CC-1, at approximately 11:00 p.m., drove the Jeep Cherokee back to the defendant's residence in Kew Gardens, New York.[3]  Cell site data places CC-1 and the defendant in the vicinity of the defendant's residence until just after midnight on June 26, 2022, at which time the defendant and CC-1 then traveled to the vicinity of CC-1's residence in Brighton.  At some point later that night, the defendant and CC-1 drove to Long Island in the Jeep Cherokee and Mercedes.  They left the Mercedes in Long Island and drove back to Brooklyn in the Jeep Cherokee.  License plate reader ("LPR") data shows that the Jeep Cherokee was on the road around 4:00 a.m., and cell site location data indicates that CC-1 was back in the vicinity of his residence in Brighton Beach around approximately 5:00 a.m.

Later that morning, at approximately 10:30 a.m. on June 26, 2022, CC-1 hired a tow truck company to pick up the Chevy Malibu from a gas station located approximately one mile from CC-1's residence and tow it to a residence in Ellenville, New York (the "Ellenville Residence").  The Ellenville Residence was occupied by CC-1's landlord's father (the "Homeowner").  CC-1 had called his landlord for permission to park a car there.  Cell site location data and LPR data indicate that around 10:30 a.m. on June 26, 2022 the defendant and CC-1 followed in close proximity to the tow truck carrying the Chevy Malibu all the way to the Ellenville Residence, which they arrived at around noon.

Once there, the defendant and the Homeowner left the property for approximately one to one-and-a-half hours to purchase groceries while CC-1 stayed behind.  Upon the defendant and Homeowner's return to the Ellenville Residence, CC-1 was observed using a garden hose to wash the trunk of the Chevy Malibu and items from the trunk, including a jack. CC-1 was also observed emptying the glove compartment of the vehicle.  Upon returning, the

---

[3]    Shabbat ended at approximately 9:21 p.m. on June 25, 2022.

defendant and CC-1 left abruptly and returned to Brooklyn in the Jeep Cherokee, leaving the groceries and Chevy Malibu behind.  According to cell site location data, the defendant and CC-1 returned to the vicinity of CC-1's residence in Brighton Beach around 9:00 p.m.

The next day, on June 27, 2022, CC-1 purchased a ticket for a Turkish Airlines flight from John F. Kennedy International Airport ("JFK Airport") to the Republic of Georgia, departing on June 28, 2022.  While at JFK Airport on June 28, 2022, law enforcement officers seized from CC-1 approximately $26,500 in cash and a receipt for the $20,000 check the Victim had obtained at TD Bank on the day of his disappearance.  CC-1's phone was also seized, which contained communications with the defendant, communications with the Victim, and a photograph of the Notarized Document, among other things.

On July 1, 2022, law enforcement agents seized the Chevy Malibu, which had been parked at the Ellenville Residence.[4]  During a subsequent search of the Chevy Malibu, tools were recovered in the trunk with the presence of the Victim's DNA and blood on them.

In the weeks that followed the Victim's disappearance, including in July and August 2022, several of the Victim's family members and friends spoke to the defendant and CC-1 on the phone about the Victim's whereabouts.  Several of these conversations were recorded and provided to law enforcement agents.  In one such conversation, the defendant acknowledged the watch deal and that he saw the Victim on June 24, 2022—the day before his disappearance.  In conversations with CC-1, CC-1 acknowledged the watch deal and the Victim's debt, and continued to demand for money related to the watch deal in exchange for

---

[4]     While visiting the Ellenville Residence on July 1, 2022, law enforcement agents showed the Homeowner photographs of the defendant and CC-1.  The Homeowner identified the defendant and CC-1 as the individuals who visited the Ellenville Residence on June 26, 2022.

information about the Victim's whereabouts.  CC-1 also stated that the defendant had information about the Victim's whereabouts.

At some point after August 2022, several individuals visited CC-1's residence in Brighton Beach on three or four occasions and removed all of CC-1's belongings.  During an interview by law enforcement agents, a witness identified one of the individuals who removed CC-1's belongings as the defendant after being shown the defendant's photograph.

For approximately eight months, the Victim's whereabouts were unknown to his family and law enforcement.  Finally, on February 21, 2023, law enforcement agents executed a search of the Ellenville Residence and found the Victim's remains on a pile of debris and junk within a wooded area approximately several hundred feet behind the Ellenville Residence.[5]  The Victim was wearing clothing and accessories consistent with what he was wearing on the day of his disappearance, and his body was wrapped in two dark-colored duffle bags that appeared consistent with the bags that CC-1 bought on the day of the Victim's disappearance.  An autopsy conducted on the Victim's body determined that the cause of death was a gunshot wound to the head and the manner of death was a homicide.

## II.   THE DEFENDANT'S ARREST, CHARGES AND THE COURT'S SUPPRESSION RULING

On February 22, 2023, the defendant was arrested on probable cause at a residence in Queens, New York.  The defendant's phone was seized[6] and he was taken to FBI

---

[5]    During the visit to the Ellenville Residence on February 21, 2023, law enforcement agents again showed the Homeowner photographs of the defendant and CC-1. The Homeowner again identified the defendant and CC-1 as the individuals who visited the Ellenville Residence on June 26, 2022.

[6]    On March 15, 2023, the Honorable Vera M. Scanlon, United States Magistrate Judge, Eastern District of New York, signed a warrant authorizing a search of the defendant's cell phone.

headquarters where, after being read and waiving his <u>Miranda</u> rights, he agreed to participate in a post-arrest interview with law enforcement agents.  The post-arrest interview was audio and video recorded.  During the interview, the defendant discussed his wholesale jewelry and diamond business, the watch deal with the Victim and CC-1, and the defendant's interactions with the Victim and CC-1 during the days surrounding the Victim's disappearance, including the defendant's trip with CC-1 to Ellenville, New York.

Later that morning, the Honorable Cheryl L. Pollak, United States Magistrate Judge, Eastern District of New York, signed a complaint and affidavit charging the defendant with extortion conspiracy, in violation of Title 18, United States Code, Section 1951(a).  On March 6, 2023, a grand jury returned an indictment charging the defendant with the same.

The defendant later moved to suppress all evidence recovered from his cell phone and his post-arrest statements on the basis that the warrantless arrest violated his constitutional rights under <u>Payton v. New York</u>, 445 U.S. 573 (1980).  <u>See</u> ECF 37-1 (Defendant's Motion to Suppress).  After a multi-day suppression hearing, the Court ordered the defendant's phone suppressed but denied suppression of his post-arrest statements.  <u>See</u> Nov. 21, 2024 Minute Entry; Feb. 14, 2025 Minute Entry (the "Suppression Hearing"); June 25, 2025 Minute Entry (notifying parties of the Court's order granting in part and denying in part the defendant's suppression motion, and providing that a written opinion was forthcoming).[7]

---

[7]    The recording of the defendant's post-arrest statement was admitted into evidence at the Suppression Hearing along with a transcript that the parties agreed was a fair and accurate transcription of the interview.  <u>See</u> Suppression Hearing Transcript ("Hr'g Tr.") at 90-91, 155-56.

ARGUMENT

I.    EVIDENCE OF THE VICTIM'S DISAPPEARANCE, MURDER AND THE
      RECOVERY OF HIS BODY IS ADMISSIBLE

At trial, the government intends to introduce evidence of threats made to the

Victim by the defendant and CC-1 as they attempted to collect on the alleged debt related to the

watch deal; their participation in the murder of the Victim; the disposal of the Victim's body at

the Ellenville Residence; and the recovery of the Victim's body by law enforcement agents.  For

the reasons set forth below, this evidence is relevant and admissible as direct evidence of the

crime to prove the violence and threats used by the defendant and CC-1 in the charged extortion

conspiracy and, in the alternative, under Federal Rule of Evidence 404(b) to show planning and

preparation, knowledge and intent, and absence of mistake or accident.

A.    Applicable Law

1.    Direct Evidence

It is well-established that evidence of uncharged acts, even uncharged acts that

amount to criminal activity, is admissible as direct evidence of the crimes charged in the

indictment "if it arose out of the same transaction or series of transactions as the charged offense,

if it is inextricably intertwined with the evidence regarding the charged offense, or if it is

necessary to complete the story of the crime on trial."  United States v. Carboni, 204 F.3d 39, 44

(2d Cir. 2000) (quoting United States v. Gonzalez, 110 F.3d 936, 942 (2d Cir. 1997)); United

States v. Robinson, 702 F.3d 22, 37 (2d Cir. 2012); United States v. Thai, 29 F.3d 785, 812 (2d

Cir. 1994); United States v. Towne, 870 F.2d 880, 886 (2d Cir. 1989).  The Second Circuit has

interpreted this category of evidence to include acts that provide necessary background or

context for a charged crime.  See, e.g., United States v. Inserra, 34 F.3d 83, 89 (2d Cir. 1994)

(noting that evidence of other "bad acts may be admitted to provide the jury with the complete

9

story of the crimes charged by demonstrating the context of certain events relevant to the charged offense"); see, e.g., United States v. Servider, No. 15-CR-174 (ENV), ECF No. 163 (May 10, 2018) (finding that evidence of the defendant's own purported involvement in the underlying scheme was "necessary to complete the story of how [the defendant] came to obstruct justice").  Accordingly, a "trial court may admit evidence that does not directly establish an element of the offense charged, in order to provide background for the events alleged in the indictment."  Gonzalez, 110 F.3d at 941-42 (quoting United States v. Coonan, 938 F.2d 1553, 1561 (2d Cir. 1991)).  Background evidence may be admitted in order to show, for example, the "circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed."  Gonzalez, 110 F.3d at 941 (quoting Coonan, 938 F.2d at 1561); accord United States v. Inniss, No. 18-CR-134 (KAM), 2019 WL 6999912, at *4 (E.D.N.Y. Dec. 20, 2019); see also United States v. Taylor, 767 F. Supp. 2d 428, 434 (S.D.N.Y. 2010) (recognizing that evidence of a false exculpatory statement made after the charged crime was committed "is admissible as circumstantial evidence of consciousness of guilt" and may strengthen an inference of criminal intent.  In addition, direct evidence may include that which shows "the development of a relationship of trust between the participants" in a crime.  United States v. Pascarella, 84 F.3d 61, 73 (2d Cir. 1996).  Indeed, as the Supreme Court has recognized, in analyzing the admissibility of evidence, the trial court should make its determinations "with an appreciation of the offering party's need for evidentiary richness and narrative integrity in presenting a case."  Old Chief v. United States, 519 U.S. 172, 183 (1997).

      2.    Federal Rule of Evidence 404(b)

      Evidence of uncharged crimes and other acts may also be admitted pursuant to Rule 404(b) for numerous permissible purposes, including to prove motive, opportunity, intent,

preparation, plan, knowledge, identity or absence of mistake or accident.  Fed. R. Evid.

404(b)(2).  See United States v. Ortiz, 857 F.2d 900, 903 (2d Cir. 1988).

       The Second Circuit has emphasized that Rule 404(b) is a rule of broad reach and

liberal application, and applies an "inclusionary approach" to admitting "other acts" evidence

under Rule 404(b).  See United States v. Garcia, 291 F.3d 127, 136 (2d Cir. 2002) (citing United

States v. Pitre, 960 F.2d 1112, 1118 (2d Cir. 1992)); see also United States v. Levy, 731 F.2d

997, 1002 (2d Cir. 1984) ("We have adopted the inclusionary or positive approach to [404(b)]; as

long as the evidence is not offered to prove propensity, it is admissible.").  A party must satisfy

three requirements for evidence of "other crimes, wrongs or acts" to be admitted under the Rule.

First, the evidence must be offered for a purpose other than to prove the defendant's bad

character or criminal propensity.  See United States v. Mickens, 926 F.2d 1323, 1328 (2d Cir.

1991) (citing United States v. Colon, 880 F.2d 650, 656 (2d Cir. 1989)).  As detailed above, such

permissible purposes include to prove motive, opportunity, intent, preparation, plan, knowledge,

identity or absence of mistake or accident.  Fed. R. Evid. 404(b)(2).  Second, the evidence must

be relevant under Rules 401 and 402 and more probative than prejudicial in accordance with

Rule 403.  See Mickens, 926 F.2d at 1328 (citing Ortiz, 857 F.2d at 903); Levy, 731 F.2d at

1002.  Third, if the defendant requests that the jury be instructed as to the limited purpose for

which the government's evidence is being admitted, the court must furnish such an instruction.

See Mickens, 926 F.2d at 1328-29; Levy, 731 F.2d at 1002.

    B.   Discussion

       1.   Direct Evidence

       Evidence of the Victim's disappearance, murder and the recovery of his body is

admissible as direct evidence (1) of elements of the charged Hobbs Act extortion conspiracy, i.e.,

that the defendant and CC-1 knowingly participated in a conspiracy in which they used threats of

violence and actual violence against the Victim to obtain the Victim's property; (2) because such evidence is part of a continuous course of conduct that is inextricably intertwined with and completes the story of the charged conspiracy; and (3) of the defendant and CC-1's consciousness of guilt, and therefore of guilt itself, for their involvement in and actions taken in furtherance of the charged conspiracy—i.e., using threats and violence against the Victim to obtain his money and property.

At trial, the government must prove that the defendant knowingly entered into an agreement to obtain property from the Victim, with the Victim's consent, through the use of actual or threatened force, violence or fear.  See 18 U.S.C. § 1951(b)(2).  To meet this burden, the government intends to introduce evidence of the Victim's disappearance and murder to prove that the defendant and CC-1 not only successfully obtained the Victim's property through the use of threats of violence but also followed through with those threats and used violence against the Victim during the course of the conspiracy.  Thus, evidence of the defendant and CC-1's involvement in the Victim's disappearance and murder is relevant and admissible to prove an element of the charged offense.

Even if the government intended to prove that the defendant and CC-1 obtained the Victim's property through threats alone—which is not the government's theory of the case— the subsequent use of violence against the Victim evidences the defendant and CC-1's state of mind and intent when they made such threats, corroborates witness testimony that such threats were actually made, and provides a basis for the jury to infer that the threats were believable enough to induce the Victim to give them his property, all of which is probative of the defendant and CC-1's involvement in a conspiracy to extort the Victim.

In addition to proving elements of the charged offense, evidence of the Victim's disappearance, murder and the recovery of his body is admissible as direct evidence because it is "inextricably intertwined with the evidence regarding the charged offense" and "necessary to complete the story of the crime on trial." Carboni, 204 F.3d at 44; see also Old Chief, 519 U.S. at 183 (recognizing that a trial court should analyze the admissibility of evidence "with an appreciation of the offering party's need for evidentiary richness and narrative integrity in presenting a case"). These actions were part of a continuous course of conduct performed by the defendant and CC-1 starting several weeks prior to the Victim's disappearance and ending once the Victim's body was recovered months later.

As detailed above, in the weeks preceding the Victim's disappearance, the defendant and CC-1 were present in the vicinity of the Victim's residence numerous times and were overheard threatening the Victim about the alleged debt. On Friday, June 24, 2022, the defendant and CC-1 met with the Victim to discuss the alleged debt and, the next day—and the last day the Victim was seen alive—the Victim gave money and transferred his Mercedes to CC-1 in connection with the debt. CC-1, who already had access to the Victim's Mercedes, then purchased the Chevy Malibu, which was not tied to his name, and duffle bags. Later that night, the defendant and CC-1 met soon after Shabbat ended and spent multiple hours near CC-1's residence, where the Chevy Malibu was parked, into the early morning hours of June 26, 2022. CC-1 then drove the Mercedes to Long Island, parked it there, and the defendant drove him back to Brooklyn in the Jeep Cherokee. Hours later that same morning, the Chevy Malibu was picked up by a tow truck hired by CC-1 and towed to the Ellenville Residence. The defendant and CC-1 followed in the Jeep Cherokee in close proximity to the Chevy Malibu until they, too, arrived at the Ellenville Residence. Once there, the defendant took the homeowner out to purchase

13

groceries, leaving CC-1 at the residence alone, and when the defendant and homeowner returned, CC-1 was hosing off the rear of the Chevy Malibu and tools from inside the trunk.  The defendant and CC-1 then drove back to Brooklyn in the Jeep Cherokee, leaving the uneaten groceries and Chevy Malibu behind.

The next day, on Sunday, June 27, 2022, CC-1 purchased a ticket on Turkish Airlines for an overseas flight that he took the next day.  Within a few weeks, law enforcement agents searched the Chevy Malibu, which was still parked at the Ellenville Residence, and found items within the vehicle that contained the Victim's blood on them.  Several months later, in February 2023, law enforcement agents discovered the Victim's body behind the Ellenville Residence wrapped in two duffle bags similar in appearance to the bags CC-1 purchased the day of the Victim's disappearance; the victim was also wearing clothing similar to the clothing he wore the day of his disappearance.  Even after the Victim's murder, CC-1 continued to try to collect on the alleged debt, demanding money from the Victim's family members and friends, and telling them if they pay, CC-1 will find out from the defendant where the Victim is.

If evidence of the Victim's disappearance, murder and recovery is not admitted, the jury will be confused about why the Victim is not available to testify at trial, what happened to the Victim after meeting with CC-1 at the bank and tax services shop, and the significance of the defendant and CC-1's actions in furtherance of the conspiracy.  For example, without this evidence, it will be difficult for the jury to understand, among other things, whether the defendant and CC-1 actually took possession of the Victim's Mercedes after the Victim signed the Notarized Document and the significance of and intent behind CC-1's purchase of the Chevy Malibu and duffle bags, which CC-1 and the defendant used in an attempt to cover up their extortion of the Victim, Gonzalez, 110 F.3d at 941.  The evidence is thus not only inextricably

14

intertwined with evidence of the charged conspiracy, but it is also necessary to "provide the jury with the complete story of the crimes charged," Inserra, 34 F.3d at 89, which began when the defendant and CC-1 surveilled the Victim's home, began threatening him for money, escalated those threats to violence and murder and then disposed of his body to cover up their crimes. See Inserra, 34 F.3d at 89 (evidence of other "bad acts may be admitted to provide the jury with the complete story of the crimes charged by demonstrating the context of certain events relevant to the charged offense").

   Additionally, evidence of the defendant and CC-1's attempts to cover up their crime through their involvement in the disappearance and disposal of the Victim's body is admissible as direct evidence of their intent and knowing involvement in the conspiracy itself. United States v. Cherry, 217 F.3d 811, 821 (10th Cir. 2000) ("We note that the scope of the conspiracy is not necessarily limited to a primary goal—such as bank robbery—but can also include secondary goals relevant to the evasion of apprehension and prosecution for that goal—such as escape, or, by analogy, obstruction of justice."). This evidence is also probative of the closeness and relationship of trust between the defendant and CC-1, Pascarella, 84 F.3d at 73, and the respective roles of the defendant and CC-1 within the Hobbs Act extortion conspiracy.

   Further, evidence of how the defendant and CC-1 disposed of the Victim's body, including using a car with no legal tie to them, at a residence in upstate New York with little association to them, is also probative of their consciousness of guilt, and thus guilt, related to the charged conspiracy. See United States v. Perez, 387 F.3d 201, 209 (2d Cir. 2004) ("Evidence of a party's consciousness of guilt may be relevant if reasonable inferences can be drawn from it and if the evidence is probative of guilt.") (citations omitted); see, e.g., Mickens, 926 F.2d at 1329 (upholding the admission of evidence of attempted witness or jury tampering as probative

of a defendant's consciousness of guilt); <u>United States v. Kirk Tang Yuk</u>, 885 F.3d 57 (2d Cir. 2018) (upholding jury instruction that jury could, but was not to required to, draw inference of defendant's consciousness of guilt if it credited government informant's testimony that defendant attempted to intimidate him); <u>United States v. Bein</u>, 728 F.2d 107, 114–15 (2d Cir. 1984) (holding that "[e]vidence of threats by a defendant against a potential witness against him can . . . be used to show guilty knowledge" if the evidence is more probative than prejudicial); <u>United States v. Mastropieri</u>, 685 F.2d 776, 790 (2d Cir. 1982) ("There can be no doubt that an attempt to suppress material records permits an inference of consciousness of guilt and therefore of guilt itself.").[8]

> For the reasons set forth above, evidence of the Victim's disappearance, murder and the recovery of his body is admissible as direct evidence of the charged Hobbs Act extortion conspiracy.

### 2. Federal Rule of Evidence 404(b)

> Evidence of the Victim's disappearance, murder and the recovery of his body is also admissible under Federal Rule of Evidence 404(b)(2) as evidence of, among other things, the defendant and CC-1's planning and preparation, knowledge and intent, and absence of mistake or accident.

---

[8]    Likewise, evidence of CC-1's flight from the United States the day after he and the defendant disposed of the Victim's body is probative of his consciousness of guilt relating to the charged crime.  <u>See United States v. Steele</u>, 390 F. App'x 6, 12 (2d Cir. 2010) (noting that it is "today universally conceded that the fact of an accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself"); <u>United States v. Salameh</u>, 152 F.3d 88, 157 (2d Cir. 1998) (holding that jury could have inferred consciousness of guilt where defendant in a bombing prosecution made arrangements to leave the country the day after the bombing).

As detailed above, this evidence establishes that the defendant and CC-1 were acting intentionally in their efforts to extort the Victim by using threats and violence, including murder, and took extensive steps to plan, execute and cover up the crime. For example, prior to completing the extortion of the Victim, CC-1 had requested and received permission from his landlord to park a vehicle at the Ellenville Residence. Rather than choose a location in Brooklyn, CC-1 specifically requested the Ellenville Residence—a location hours away from Brooklyn and with limited ties to CC-1 or the defendant. CC-1 also bought the Chevy Malibu with cash and declined to complete any paperwork prior to leaving the dealership, ensuring that the vehicle could not be linked to him or the defendant. CC-1 also took no issue with the fact that the Chevy Malibu had electrical issues because he knew that it was simply a tool to dispose of the Victim rather than to be used as a vehicle. The defendant and CC-1 took these steps to separate themselves from their crime and hide the fact that they used violence—indeed, the ultimate form of violence—and threats to collect on the alleged debt owed by the Victim. Thus, this evidence also establishes that the defendant and CC-1 did not commit this crime by mistake or accident—rather, this was a calculated, intentional plan.

The evidence will also serve to demonstrate that the defendant had the requisite knowledge and intent regarding the charged conspiracy and to rebut claims by the defendant that he was not engaged in a conspiracy at the time of the charged offense, and that he was merely an unwitting participant in CC-1's extortion of the Victim, see Suppression Hearing Tr. 133-135; ECF No. 95 (Defendant Motions in Limine) at 3. See United States v. Martino, 759 F.2d 998, 1004 (2d Cir. 1985) (affirming introduction of evidence of a prior drug conviction in a trial for narcotics conspiracy where defendant placed at issue the question of knowledge and intent as to his participation in the charged conspiracy and association with alleged co-conspirators, and

17

argued that he was merely present at the scene); United States v. Santiago, 199 F. Supp. 2d 101, 109-110 (S.D.N.Y. 2002) (introducing evidence of defendant's prior drug transactions in drug conspiracy trial because they were "probative of his intent or knowledge in connection with the charged conspiracy" and to rebut the defendant's claim of innocent association with individuals in the area where the conspiracy operated); United States v. Zackson, 12 F.3d 1128, 1183 (2d Cir. 1993) (where the defense of lack of intent is apparent from the outset of the trial, it is proper to allow the government to introduce Rule 404(b) evidence in its case-in-chief).

### 3.  Federal Rule of Evidence 403

Federal Rule of Evidence 403 permits the Court to exclude "relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403. Thus, the Court's analysis depends both on how probative the evidence sought to be excluded is and how unfair the prejudice is were the evidence admitted.

Here, the probative value of the evidence of the Victim's disappearance, murder and the recovery of his body substantially outweighs the potential prejudice. As detailed above, the probative value of this evidence is substantial given that it establishes a critical element of the charged Hobbs Act extortion conspiracy—that the defendant and CC-1 used violence, and credible threats of violence, to induce the Victim to provide them with money and property. Courts regularly introduce evidence of a defendant's involvement in other crimes, even crimes unrelated to the charged crimes, to establish intent or knowledge in a charged conspiracy despite prejudice that arises from such evidence. See, e.g., Martino, 759 F.2d at 1004. Because the murder and disposal of the Victim's body occurred to further the charged extortion conspiracy, the evidence is highly probative of the conspiracy itself. Though the commission of murder is generally more severe than extortion, this is not a case in which the evidence of a murder arises from a prior conviction or is otherwise separate from the charged crime. Rather, here, the

18

probative value of the evidence substantially outweighs the prejudice because the evidence of the murder is part and parcel to—indeed, inextricably intertwined with—the charged conspiracy, and precluding it would confuse the jury and prevent the government from proving the charged offense.

II.     PHOTOGRAPHIC EVIDENCE OF CRIME SCENE AND AUTOPSY IS ADMISSIBLE

        The government intends to introduce a limited number of photographs depicting the recovery of the Victim's body behind the Ellenville Residence, as well as autopsy photographs of the Victim's remains, clothing and the bags in which he was recovered.  The Second Circuit has made clear that the graphic nature of crime scene or autopsy photographs does not alone render them inadmissible.  See United States v. Salim, 189 F. Supp. 2d 93, 98 (S.D.N.Y. 2002) (collecting cases).  The analysis of admissibility "hinges upon whether the photograph is relevant to the resolution of some disputed point in a trial or otherwise aids a jury in a factual determination."  Id.

        As detailed above, evidence pertaining to the Victim's disappearance, murder and the recovery of his body is admissible as direct evidence of the defendant and CC-1's use of threats and violence and because it is part of a continuous course of conduct that completes the story of the charged crime.  The crime scene and autopsy photographs, which depict what the Victim was wearing when he died, the bags in which his body was discovered, and the manner in which he was disposed, provide a basis for the jury to understand and is probative evidence of why CC-1 bought the duffle bags (and Chevy Malibu) hours after visiting the bank and notary, the defendant and CC-1's use of violence to collect the alleged debt, and their consciousness of guilt.

19

The government has substantially limited the number of autopsy and crime scene photographs it intends to offer in order to minimize any potential prejudice and ensure that the photographs are not cumulative of one another.  These photographs, even where other pieces of evidence may corroborate or establish certain facts, are squarely admissible in criminal cases. See generally Old Chief, 519 U.S. at 182-83; United States v. Pena, No. 21-CR-176 (AMD) (E.D.N.Y. 2024) (admitting autopsy and crime scene photographs in a murder trial over defendant's objection that they are cumulative of other evidence and unduly prejudicial); United States v. Powell, No. 21-CR-572 (EK) (E.D.N.Y. 2025) (admitting autopsy and crime scene photographs in a murder trial).

III.    STATEMENTS OF THE DEFENDANT, CC-1 AND THE VICTIM INTRODUCED BY THE GOVERNMENT ARE ADMISSIBLE

The government intends to offer evidence of statements made by the defendant, CC-1 and the Victim.  The statements of the defendant are admissible by the government as statements of an opposing party.  See Fed. R. Evid. 801(d)(2)(A).  The statements of CC-1 are admissible either as co-conspirator statements under Federal Rule of Evidence 801(d)(2)(E) because CC-1 participated in the charged Hobbs Act extortion and the statements sought to be introduced were made in furtherance of that conspiracy, see Fed. R. Evid. 801(d)(2)(E),[9] or as statements of an unavailable declarant against interest under Federal Rule of Evidence

---

[9]    The government does not ask the Court to rule on the admissibility of any particular out-of-court statements by CC-1 that the government intends to offer at this time, but merely provides notice of the types of statements the government will seek to introduce.  The Court should admit these statements at the appropriate time.  As the Second Circuit has long held, "statements proffered as coconspirator statements may be admitted in evidence on a conditional basis, subject to the later submission of the necessary evidence of" the requirements of Rule 801(d)(2)(E).  United States v. Tracy, 12 F.3d 1186, 1199 (2d Cir. 1993); accord United States v. Vidal, No. 22-2857-CR, 2024 WL 397630, at *4 (2d Cir. Feb. 2, 2024); see also, e.g., United States v. Shyne, No. 05-CR-1067 (KMK), 2007 WL 1075035, at *34 (S.D.N.Y. Apr. 5, 2007) ("A trial court need not . . . make these determinations prior to trial.").

804(b)(3)(B), see Fed. R. Evid. 804(b)(3)(B).  The statements of the Victim are admissible because the Victim, who is dead, is unavailable to testify and the defendant wrongfully caused, or acquiesced in wrongfully causing, the Victim's unavailability, intending that result.  See Fed. R. Evid. 804(b)(6).  The government further respectfully requests that the Court hold that the defendant may not admit otherwise hearsay statements under these exceptions, either on cross-examination or in his case-in-chief.

A.    Applicable Law

The Federal Rules of Evidence define hearsay as "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."  Fed. R. Evid. 801(c). "Hearsay is not admissible unless any of the following provides otherwise: a federal statute; [the Rules of Evidence]; or other rules prescribed by the Supreme Court."  Fed. R. Evid. 802.  Not all out-of-court statements offered for their truth are hearsay.

1.    The Defendant's Statements

Out-of-court statements made by a defendant are not hearsay when introduced by the government to prove the truth of the facts stated therein because they are admissions of an opposing party.  See Fed. R. Evid. 801(d)(2)(A) (a statement offered against an opposing party that "was made by the party in an individual or representative capacity" is not hearsay); United States v. Kone, 216 F. App'x 74, 76 (2d Cir. 2007) ("Statements made by the defendant, where relevant, may be introduced by the government in a criminal trial to prove the truth of the facts stated in them because they are admissions of an adverse party.").

2.    CC-1's Statements in Furtherance of the Conspiracy

Rule 801(d)(2)(E) excludes from the definition of hearsay statements admitted by the government that were "made by the party's co-conspirator during and in furtherance of the

21

conspiracy." A co-conspirator statement may be admitted by the government if the court finds

by a preponderance of the evidence that (1) the conspiracy existed at the time the statement was

made; (2) both the declarant and the defendant were part of the conspiracy; and (3) the statement

was made in furtherance of the conspiracy. Bourjaily v. United States, 483 U.S. 171 (1987); see

also United States v. Gigante, 166 F.3d 75 (2d Cir. 1998). While the hearsay statement itself

may be considered in establishing the existence of the conspiracy, "there must be some

independent corroborating evidence of the defendant's participation in the conspiracy." Gigante,

166 F.3d at 82.

       As to the third "requirement that the challenged statement be 'in furtherance of'

the conspiracy," it "is satisfied if the statement's objective is 'designed to promote or facilitate

achievement of the goals of the conspiracy.'" United States v. Malka, 602 F. Supp. 3d 510, 535

(S.D.N.Y. 2022) (quoting United States v. Rivera, 22 F.3d 430, 436 (2d Cir. 1994)). Courts in

this District have repeatedly held that this standard is "is not very restrictive." E.g., United

States v. Kurland, No. 20-CR-306 (S-1) (NGG), 2022 WL 2669897, at *3 (E.D.N.Y. July 11,

2022). "[S]tatements made during the course and in furtherance of a conspiracy must be such as

to prompt the listener . . . to respond in a way that promotes or facilitates the carrying out of a

criminal activity." Gigante, 166 F.3d at 82. "This can include those statements that provide

reassurance, or seek to induce a co-conspirator's assistance, or serve to foster trust and

cohesiveness, or inform each other as to the progress or status of the conspiracy." Id.; see also

United States v. Russo, 302 F.3d 37, 46 (2d Cir. 2002) (statements which "inform . . . [co-

conspirators] of the status of the conspiracy are in furtherance of the conspiracy within the

meaning of 801(d)(2)(e)"); United States v. Rahme, 813 F.2d 31, 36 (2d Cir. 1987) (statements

"that apprise a co-conspirator of the progress of the conspiracy" are in furtherance of the

conspiracy).  Relatedly, the Second Circuit has held that a status update is sufficient to satisfy the "in furtherance" requirement of Rule 801(d)(2)(E).  United States v. Amato, 15 F.3d 230, 234 (2d Cir. 1994); see also United States v. Stewart, 433 F.3d 273, 293 (2d Cir. 2006) (holding that the statement need not actually further the conspiracy, but instead need only be made with the intent to further some objective of the conspiracy); United States v. Schlesinger, 372 F. Supp. 711, 720 (E.D.N.Y. 2005).  Notably, "[a] statement need not be made by one co-conspirator to another co-conspirator in order to be in furtherance of a conspiracy."  Malka, 602 F. Supp. 3d at 535; accord United States v. Neumann, No. 21-CR-439 (NSR), 2023 WL 8700974, at *3 (S.D.N.Y Dec. 14, 2023); United States v. Weingarten, No. 19-CR-497 (NSR), 2024 WL 677995, at *12 (S.D.N.Y. Feb. 15, 2024).

Statements apprising co-conspirators of past events also often further the conspiracy.  See, e.g., United States v. Jefferson, 215 F.3d 820, 824 (8th Cir. 2000) ("Statements that describe past events are in furtherance of the conspiracy if they are made . . . simply to keep co-conspirators abreast of current developments and problems facing the group."); United States v. Salerno, 868 F.2d 524 (2d Cir. 1987) (statements were made to further the goals of the charged conspiracy where conversations about past events helped to coordinate future criminal activities and brief co-conspirators).  In addition, statements in furtherance of concealing an ongoing conspiracy are in furtherance of that conspiracy and, therefore, are relevant and admissible at trial.  See United States v. Eisen, 974 F.2d 246, 269 n.8 (2d Cir. 1992) ("[C]learly, acts or statements designed to conceal an ongoing conspiracy are in furtherance of that conspiracy."); United States v. Kahale, 789 F. Supp. 2d 359, 384 (E.D.N.Y. 2009) (holding that "an act taken to conceal an ongoing illegal agreement . . . constitutes an act in furtherance of the charged conspiracy, and is admissible"); cf. United States v. Mermelstein, 487 F. Supp. 2d 242,

261 (E.D.N.Y. 2007) ("Efforts to conceal an ongoing conspiracy may properly be charged as overt acts in furtherance of it.").

### 3.    CC-1's Statements Against Penal Interest

Certain of CC-1's statements are also admissible as statements against interest made by an unavailable declarant.  "A declarant is considered to be unavailable as a witness if the declarant . . . is absent from the trial or hearing and the statement's proponent has not been able, by process or other reasonable means, to procure . . . the declarant's attendance or testimony, in the case of a hearsay exception under Rule 804(b)(2), (3), or (4)."  Fed. R. Evid. 804(a)(5)(B).  One such "process" to procure a declarant's attendance or testimony is via a subpoena under 28 U.S.C. § 1783.  See Fed. R. Crim. P. 17(e)(2) ("If the witness is in a foreign country, 28 U.S.C. § 1783 governs the subpoena's service."); United States v. Helbrans, No. 19-CR-497 (NSR), 2021 WL 4778525, at *20 (S.D.N.Y. Oct. 12, 2021).  However, subpoenas under 28 U.S.C. § 1783 apply only to United States citizens residing abroad.  See Helbrans, 2021 WL 4778525, at *20.  Accordingly, non-U.S. citizens living abroad are unavailable for purposes of Federal Rule of Evidence 804.  See id.; see also United States v. Tan, No. 21-CV-126, 2022 WL 15522231, at *1 (E.D. La. Oct. 27, 2022) (collecting cases).

Statements made against an unavailable declarant's own penal interest are admissible pursuant to Federal Rule of Evidence 804(b)(3).  If the declarant is unavailable, the court must undertake a two-step analysis to determine admissibility.  United States v. Dupree, 870 F.3d 62, 80 (2d Cir. 2017).  First, the court "conducts an adequately particularized analysis to determine whether a reasonable person in the declarant's shoes would have perceived the statement as detrimental to his or her own penal interest in light of all the surrounding circumstances."  Id. (internal quotation, alterations and citations omitted).  The statement "need not have been sufficient, standing alone, to convict the declarant of any crime."  Id. (internal

24

quotations, citations and alterations omitted). Instead, Rule 804(b)(3) encompasses disserving statements by a declarant that would have probative value in a trial against the declarant. <u>See, e.g.</u>, <u>id.</u>; <u>United States v. Gupta</u>, 747 F.3d 111, 127 (2d Cir. 2014); <u>United States v. Persico</u>, 645 F.3d 85, 102 (2d Cir. 2011). Nor does the Rule "require that the declarant be aware that the incriminating statement subjects him to immediate criminal prosecution." <u>Persico</u>, 645 F.3d at 102 (quotation marks omitted).

Second, the court "looks for corroborating circumstances indicating both the declarant's trustworthiness and the truth of the statement." <u>Id.</u> (internal quotation and citations omitted). Circumstances indicating trustworthiness include where (1) the declarant equally inculpates himself along with the defendant and does not engage in blame-shifting or role-minimizing; (2) there is no apparent self-interested motive for the declarant to inculpate the defendant; (3) there is no coercion present; (4) the statement was made to a person whom the declarant believes is an ally. <u>See, e.g.</u>, <u>United States v. Tyrell</u>, 840 F. App'x 617, 622 (2d Cir. 2021); <u>United States v. Saget</u>, 377 F.3d 223, 230 (2d Cir. 2004); <u>United States v. Sasso</u>, 59 F.3d 341, 349-50 (2d Cir. 1995).

Finally, it is well established that statements against penal interest not made to law enforcement are typically not testimonial and thus do not implicate the Confrontation Clause. <u>See, e.g.</u>, <u>United States v. Wexler</u>, 522 F.3d 194, 202 (2d Cir. 2008) ("Whatever the contours of the definition of 'testimonial,' it seems clear to us that statements against penal interest of the type made by Abler [to various witnesses] do not fall within them." (internal citation omitted)); <u>Tyrell</u>, 840 F. App'x at 623 ("Our court has held that the confrontation clause has no applicability outside of testimonial statements, including in a situation where a defendant's non-testimonial self-incrimination implicates another defendant."); <u>Malka</u>, 602 F.

25

Supp. 3d at 535 ("[B]ecause statements to associates about crimes in which the declarant participated are not testimonial, the admission of such statements does not violate the Confrontation Clause.").

    4. The Victim's Statements

    Rule 804(b)(6) provides that "[a] statement offered against a party that wrongfully caused—or acquiesced in wrongfully causing—the declarant's unavailability as a witness, and did so intending that result" is not excluded by the rule against hearsay. Fed. R. Evid. 804(b)(6). A deceased declarant is unavailable. See Fed. R. Evid. 804(a)(4). The Second Circuit has made clear that a district court "may admit hearsay evidence as to statements by an unavailable declarant if it finds by a preponderance of the evidence that (a) the party against whom the out-of-court statement is offered was involved in, or responsible for, procuring the unavailability of the declarant through knowledge, complicity, planning or in any other way, and (b) that party acted with the intent of procuring the declarant's unavailability as an actual or potential witness." United States v. Stewart, 485 F.3d 666, 670-71 (2d Cir. 2007); United States v. Dhinsa, 243 F.3d 635, 651–53 (2d Cir. 2001) (Rule 804(b)(6) has "no limitation on the subject matter of the statements that it exempts from the prohibition on hearsay evidence."). A defendant can be said to have caused, or acquiesced the causing of, a declarant's unavailability if "the wrongful procurement [of the declarant's unavailability] was in furtherance, within the scope, and reasonably foreseeable as a necessary or natural consequence of an ongoing conspiracy." Cherry, 217 F.3d at 820; see also United States v. Chester, No. 13-CR-774, 2017 WL 3394746, at *33 (N.D. Ill. Aug. 8, 2017) ("a defendant who knowingly participates in a conspiracy involving a foreseeable act of witness murder to conceal and protect the conspiracy is one who 'acquiesces' for purposes of Rule 804(b)(6)"). "The term 'acquiesce,' within the meaning of Rule 804(b)(6), encompasses wrongdoing that, while not directly caused by a

defendant coconspirator, is nevertheless attributable to that defendant because he accepted or tacitly approved the wrongdoing."  United States v. Dinkins, 691 F.3d 358, 384 (4th Cir. 2012) (citing United States v. Thompson, 286 F.3rd 950 (7th Cir. 2002)).

    B.    Discussion

        1.    The Defendant's Statements Are Admissible

The government intends to offer at trial various statements made by the defendant, including, among others, text message communications between the defendant and CC-1, text message communications between the defendant and the Victim, statements made by the defendant to the Victim which were made in the presence of and overheard by other witnesses, statements made by the defendant to law enforcement officers following the defendant's arrest and audio recordings of conversations between the defendant and other witnesses.  These statements are plainly admissible as statements of an opposing party.  See Fed. R. Evid. 801(d)(2)(A).

        2.    Statements by CC-1 Are Admissible as Co-Conspirator Statements

In addition to the defendant's own statements, the government intends to admit evidence of oral statements and text messages made by CC-1 in furtherance of the charged conspiracy.  For example, the government intends to introduce text messages between CC-1 and the defendant and between CC-1 and the Victim, which relate to or are evidence of the failed watch deal.  The government also intends to introduce evidence of statements CC-1 made to the Victim which constitute direct evidence of the charged extortion scheme, including threats to the Victim, which were overheard by other witnesses.  The government also intends to introduce evidence of statements made by CC-1 to various individuals on June 25 (the day CC-1 was with the Victim and the day the Victim was last seen alive) and June 26, 2022 (the day CC-1 and the defendant were together in Ellenville, New York).  These statements include, for example,

statements made by CC-1 to employees at the bank he visited with the Victim on June 25, 2022, the notary he visited with the Victim on June 25, 2022, the car dealership from which he purchased the vehicle on June 25, 2022 that was towed to the Ellenville Residence on June 26, 2022, and the Homeowner of the Ellenville Residence. The government also intends to introduce evidence of statements by CC-1 to family members and friends of the Victim following the events of June 25-26, 2022, in which CC-1 continued to try to obtain money from the Victim's family and friends.  As noted above, the government is not at this time asking the Court to rule on the admissibility of any particular out-of-court statements by CC-1 that the government intends to offer but is merely providing the Court with notice of the types of statements the government will seek to introduce.

      3.   <u>CC-1's Statements are Admissible as Statements Against Penal Interest</u>

CC-1 is not a United States citizen.  Rather, he is a citizen of Uzbekistan and, based on the most recent information known to the government, is currently residing in Uzbekistan.  Accordingly, CC-1 is considered an unavailable declarant under Federal Rule of Evidence 804(a)(5)(B).

In the days and weeks following the Victim's disappearance, CC-1 had a series of telephone and text message conversations with various of the Victim's family members and friends.  In these conversations, CC-1 attempted to negotiate with the Victim's family and friends for the additional payment of money by the Victim's family and friends to CC-1 in exchange for information on the Victim's whereabouts.  Not only are these statements admissible as co-conspirator statements made in furtherance of the ongoing extortion conspiracy, but they are admissible as statements against penal interest.

Following the Victim's disappearance, CC-1 told the Victim's son that the Victim owed CC-1 money for the watches that the Victim had received from CC-1.  This statement is

against CC-1's penal interest because it is probative of the existence of the failed watch deal. The statement also bears indicia of reliability because CC-1 implicated only himself, CC-1 was not coerced into making the statement and CC-1 in that moment would have viewed the Victim's son as an ally insofar as he was attempting to convince him to pay off his father's debt for him.

    For example, on July 12, 2022, CC-1 told an associate of the Victim the following: "I told you I would find him [the Victim]. If you could solve this in the next 2-3 days it would be good. Please, I need the money . . . I need to protect myself in Israel too and everywhere else I want to protect myself. In Israel, I won't get the money, my people will get the money . . . I need to get the money but I won't be the one getting it, my people will because I don't want to put myself at risk." This statement is clearly a statement against CC-1's penal interest because it is probative of the fact that the Victim owed CC-1 money, which was the motivation for CC-1 and the defendant to engage in the extortion conspiracy at the heart of this case. These statements also show that the extortion conspiracy continued beyond the Victim's disappearance and murder. Even after the Victim was murdered, CC-1 continued to try to extort the Victim's family and friends for more money using an implied threat of violence. In these phone calls, the Victim's family and friends repeatedly ask CC-1 whether the Victim is alive or dead and they clearly are fearful that the Victim is dead. By refusing to confirm or deny whether the Victim was still alive, and instead by dangling in front of the Victim's family and friends the prospect that he would disclose additional information about the Victim's whereabouts in exchange for more cash, CC-1 deployed additional threats in further of the conspiracy—i.e., the threat that if the Victim were still alive he could suffer additional harm if more money was not paid—in an attempt to extort the Victim's family and friends into paying.

On July 14, 2022, CC-1 had another conversation with an associate of the Victim, in which CC-1 again attempted to negotiate for the receipt of additional money. On the call, CC-1 stated: "Tell him [another of the Victim's associates] to put the money next to my door. He can even go inside my house and put it in there . . . I'm going to get the money either way. I don't care about any problem. I'm going to have my money." As above, this statement is a statement against CC-1's penal interest because it is probative not only of the fact that the Victim owed CC-1 money, but that CC-1 continued to use threats of violence to collect this money even after the Victim disappeared, and is thus probative of the extortion conspiracy at issue here. In addition to these specific statements, in both conversations, the persons with whom CC-1 is speaking make repeated references to the fact that the Victim owed CC-1 money, which CC-1 did not deny. CC-1's statements in response to his counterparts' statements that the Victim owed CC-1 money, and specifically his lack of denials in response to this statements, are tantamount to admissions against CC-1's penal interest.

Both of these statements bear indicia of reliability. CC-1 inculpates himself in these statements, he is not being coerced into making the statements and he is making the statements to someone who he believes may be able to help him obtain the money that he believes he is owed—i.e., someone CC-1 would have viewed as a potential ally in that moment. Accordingly, these statements should be admitted.

### 4.    The Victim's Statements are Admissible

The government intends to introduce statements made and text messages sent by the Victim to various witnesses, as well as the Victim's statements and text messages to the defendant and CC-1. The Victim, who is deceased, is an unavailable declarant. See Fed. R. Evid. 804(a)(4); see United States v. Amato, No. 03-CR-1382 (NGG), 2006 WL 1788190, at *1 (E.D.N.Y. June 26, 2006). The government intends to establish by a preponderance of the

evidence that the defendant and CC-1 together wrongfully caused, or acquiesced in causing, the Victim's unavailability, with the intent of rendering the Victim unavailable. The government intends to introduce evidence establishing the defendant and CC-1's role in arranging for the transport of the Victim's body to the Ellenville Residence and taking steps to hide the Victim's body behind the Ellenville Residence. The government also intends to introduce additional evidence that is probative of the defendant's role in causing or concealing the murder of the Victim. As discussed above, the Victim's murder was part and parcel of the charged conspiracy and the defendant's role in concealing the murder is evidence that he participated in, or at the very least acquiesced in, the conduct that rendered the Victim unavailable to testify.

As discussed above, a defendant can be said to have caused or acquiesced in the causing of a declarant's unavailability if the procurement of the unavailability was in furtherance, within the scope or a reasonable foreseeable consequence of the conspiracy. See Cherry, 217 F.3d at 820. The government intends to introduce evidence that the defendant and CC-1 had threatened the Victim with violence if the Victim did not satisfy his debt owed to them. Under these circumstances, there can be no question that the Victim's murder was a reasonably foreseeable consequence of an extortion conspiracy in which the defendant and CC-1 threatened the Victim with violence.

5.    Additional Portions of the Defendant's Statements Are Inadmissible If Offered by the Defendant

Further, the Court should preclude the defendant from admitting other statements or portions of statements made by the defendant or co-conspirators, either on cross-examination or in his case-in-chief, because such testimony would constitute hearsay without any exception.

It is well established that a defendant generally is prohibited from introducing his own out-of-court statements at trial. See United States v. Marin, 669 F.2d 73, 84 (2d Cir. 1982)

31

("When the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible."); United States v. Blake, 195 F. Supp. 3d 605, 610 (S.D.N.Y. 2016) ("When the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible.").  Therefore, a "court may . . . exclude any portion that consists largely of a defendant's own self-serving statements, which, as offered by him, are inadmissible hearsay."  United States v. Mahaffy, No. 05-CR-613 (ILG), 2007 WL 1094153, at *2 (E.D.N.Y. Apr. 10, 2007); see also United States v. Yousef, 327 F.3d 56, 153 (2d Cir. 2003) ("[W]hile the Government was free to introduce the statement as an admission by a party-opponent, [the defendant] had no right to introduce it on his own.").  Were the law otherwise, a defendant "could effectuate an end-run around the adversarial process by, in effect, testifying without swearing an oath, facing cross-examination, or being subjected to first-hand scrutiny by the jury."  United States v. McDaniel, 398 F.3d 540, 545 (6th Cir. 2005).

Nor, except in extremely limited circumstances, may a defendant introduce his own out-of-court statements as evidence of his state of mind.  The state-of-mind exception to the hearsay rule allows into evidence "[a] statement of the declarant's then-existing state of mind . . . but not including a statement of memory or belief to prove the fact remembered or believed."  Fed. R. Evid. 803(3).  The state of mind must be relevant, and the statement cannot be offered for any underlying truth independent of the state of mind.  See Funk v. Belneftekhim, No. 14-CV-0376 (BMC), 2018 WL 11169575, at *3 (E.D.N.Y. Nov. 30, 2018) (denying admission of statements under Rule 803(3) because "[n]either statement shows [declarant's] knowledge or state of mind independent from the truth of what it asserts and it is not clear how [declarant's] state of mind is relevant.").  "The exclusion of statement[s] of memory or belief [proffered] to prove the fact remembered or believed is necessary to prevent the exception from swallowing the

hearsay rule. This would be the result of allowing one's state of mind, proved by a hearsay statement, to provide an inference of the happening of an event that produced the state of mind." United States v. Cardascia, 951 F.2d 474, 487 (2d Cir. 1991).

A defendant also may not introduce his own statements pursuant to the rule of completeness without complying with its strict terms. Fed. R. Evid. 106 permits inclusion of otherwise hearsay testimony only where it is "essential to explain an already admitted document, to place the admitted document in context, or to avoid misleading the trier of fact." United States v. Gotti, 457 F. Supp. 2d 395, 397-98 (S.D.N.Y. 2006). Self-serving statements are not admissible by a defendant unless "their exclusion would unfairly distort the meaning of the declarant's non-hearsay statements that are in evidence." United States v. Harper, No. 05-CR-6068 (DGL), 2009 WL 140125, at *5 (W.D.N.Y. Jan. 20, 2009). Accordingly, the Second Circuit has excluded hearsay statements offered by the defendant that, by their omission, do not distort the admitted statements. See United States v. Gonzalez, 399 F. App'x 641, 645 (2d Cir. 2010) (affirming district court's decision to exclude portion of defendant's statement where admitted portion did not distort the meaning of the full statement); United States v. Johnson, 507 F.3d 793, 796 (2d. Cir. 2007) (affirming district court's decision to exclude portions of confession that did not explain the admitted portion or place the admitted portion in context, noting that while "[t]he admitted portion of the confession related to . . . plans to execute the robbery, . . . the redacted portion related to the execution of the robbery"). As the Second Circuit has explained, a defendant may not introduce other parts of the same statement offered in part by the government unless the defendant makes a proper showing that the statements he seeks to introduce have a separate basis for admission. See United States v. Jackson, 180 F.3d 55, 73 (2d Cir. 1999) (rejecting claim under the completeness doctrine that later portions of conversation

33

provided relevant context and noting that "the portions of the tape proffered by [defendant] consisted largely of [his] own self-serving statements, which, as offered by him, are inadmissible hearsay").  The completeness doctrine does not "require the admission of portions of a statement that are neither explanatory of nor relevant to the admitted passages." <u>Johnson</u>, 507 F.3d at 796.

Because "Rule 106 does not render admissible evidence that is otherwise inadmissible," <u>United States v. Terry</u>, 702 F.2d 299, 314 (2d Cir. 1983), and for the reasons stated above, the Court should preclude the defendant from attempting to admit his own statements under Rule 106, <u>see</u> <u>Gonzalez</u>, 399 F. App'x at 645 (noting that the rule of completeness cannot be used as a "mechanism to bypass [evidentiary] rules").

Finally, a defendant also may not admit his or co-conspirators' statements under Fed. R. Evid. 801(d)(2)(E).  Such statements would not be an "opposing party" statement as to the defendant.  Thus, for example, courts have held that the "co-conspirator exception is a one-way street down which only the government may travel."  <u>United States v. Persico</u>, No. 04-CR-911 (SJ), 2006 WL 3246922, at *1 (E.D.N.Y. Nov. 8, 2006); <u>see also</u> <u>United States v. James</u>, No. 02-CR-778 (SJ), 2007 WL 2702452, at *1 (E.D.N.Y. Sept. 12, 2007) (a co-conspirator statement made "'during the course and in furtherance of the conspiracy is one type of '[a]dmission by party-opponent' defined as nonhearsay, but only if 'offered against' the party. The statement of a co-conspirator, offered for its truth by a co-conspirator, does not fall within this Rule.").

## IV.    CERTIFIED BUSINESS AND PUBLIC RECORDS ARE ADMISSIBLE

At trial, the government intends to introduce certified business records including, but not limited to, the following: T-Mobile subscriber, toll, and cell-site records; New York State Department of Motor Vehicle ("DMV") records for the Chevy Malibu, Jeep Cherokee, and

Mercedes; iCloud records from Apple, Inc. related to the defendant and the Victim; and bank records related to the defendant, CC-1 and the Victim.

As detailed above, the defendant and CC-1 used their cellular telephones leading up to and after the extortion and murder of the Victim. Accordingly, the government intends to introduce at trial the subscriber information, toll records and cell-site data associated with the use of those telephones. The cell site and toll records are relevant to show the defendant's movements with CC-1 before and after the extortion and the frequency with which they communicated. The government also intends to introduce DMV records relating to the Jeep Cherokee, Chevy Malibu and Mercedes to establish ownership and use of those vehicles. Additionally, the government intends to introduce bank records to show the receipt of money in connection with the extortion conspiracy and to corroborate witness testimony related to certain events.

All of these records were records kept in the ordinary course of business; and the certifications establish that these records are true and complete copies of the records kept in the ordinary course of business. See Fed. R. Evid. 803(6) and 902(11). The Supreme Court has held that admitting business records that have been authenticated by affidavit or certificate does not violate a defendant's right to confrontation. See Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009). The Court has explained that "[b]usiness and public records are generally admissible absent confrontation . . . because—having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial—they are not testimonial." Id. at 324.

Relying on Melendez-Diaz, the Second Circuit and at least five other circuits have concluded that certifications authenticating records are not testimonial and therefore are

35

permissible.  See, e.g., United States v. Qualls, 613 F. App'x 25, 28 (2d Cir. 2015); United States v. Johnson, 688 F.3d 494, 504-05 (8th Cir. 2012); United States v. Yeley-Davis, 632 F.3d 673, 680-81 (10th Cir. 2011); United States v. Morgan, 505 F.3d 332, 339 (5th Cir. 2007); United States v. Ellis, 460 F.3d 920 (7th Cir. 2006); United States v. Weiland, 420 F.3d 1062, 1077 (9th Cir. 2005).  As the Seventh Circuit explained in Ellis, an authenticating certification under Rule 902(11) is "nothing more than the custodian of records . . . attesting that the submitted documents are actually records kept in the ordinary course of business" and "merely establish the existence of the procedures necessary to create a business record."  460 F.3d at 927.  It is the underlying records, not the certification, that are introduced to establish the facts at trial.

Consistent with this understanding of the confrontation right, federal law permits the authentication of business records by certification and sets forth specific requirements for their admission.  Federal Rule of Evidence 902(11) expressly permits the authentication of domestic business records by certification.  Courts in the Second Circuit have routinely applied these provisions to admit certified business records at trial.  See, e.g., United States v. Komasa, 767 F.3d 151 (2d Cir. 2014); Qualls, 613 F. App'x at 28 (affirming district court decision to allow government to offer into evidence foreign business records based upon a certification, absent a live witness to authenticate the documents).  Similarly, Rule 803(6)(D) provides that a document may be qualified as a record of a regularly conducted activity "by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification."  Fed. R. Evid. 803(6)(D); see also United States v. Michel, 879 F. Supp. 2d 291, 304 n.13 (E.D.N.Y. 2012) (bank representative's signed declaration under penalty of perjury sufficiently laid foundation for admission of bank records).  Thus, "Rule 902(11) extends Rule 803(6) 'by allowing a written foundation in lieu of an oral one.'"  United States v. Rom, 528 F. App'x 24, 27 (2d Cir. 2013)

(summary order) (citing 5 Weinstein's Federal Evidence § 902.13[1] (2d ed. 2008)).  Likewise, under Federal Rule of Evidence 902(1), domestic public documents are self-authenticating and "require no extrinsic evidence of authority in order to be admitted" so long as they bear "a seal purporting to be that of the United States" or "any state" of the United States" and bear a "signature purporting to be an execution or attestation."

The government should be permitted to authenticate and admit the relevant records using certifications because it is proper under the law.  The government intends to offer these records at trial under Rules 803(6)(D), 902(1), 902(11) and 902(13) pursuant to certifications that meet the requirements of Rule 803(6)(A)-(C).  The government has previously produced certifications and underlying business and public records in discovery, and will continue to produce such records in advance of trial.  The defendant is hereby informed of the government's intention to offer them as evidence at trial.  Such a process would eliminate unnecessary persons from the courtroom, shorten the amount of time that jurors will need to sit for trial, and ensure that witnesses who may reside outside New York need not travel to New York to appear at trial.  Accordingly, the government seeks a pretrial ruling that these records may properly be authenticated as self-authenticating business and public records pursuant to Rules 803(6)(D), 902(1), 902(11) and 902(13).

V.    THE GOVERNMENT SHOULD BE PERMITTED TO INTRODUCE, ON CROSS-EXAMINATION OF THE DEFENDANT, EVIDENCE OTHERWISE SUPPRESSED FOR IMPEACHMENT PURPOSES

The Court suppressed the defendant's phone seized incident to his arrest and evidence obtained therefrom.  However, the government should be permitted to introduce the suppressed evidence during cross-examination of the defendant to impeach the defendant should he give false or inconsistent testimony.  As the Supreme Court observed, "[i]t is one thing to say

37

that the Government cannot make an affirmative use of evidence unlawfully obtained.  It is quite another to say that the defendant can turn the illegal method by which evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths."  Walder v. United States, 347 U.S 62, 65 (1954).  Following this principle, the Second Circuit has held that "[w]hen a defendant offers an innocent explanation" for his conduct, "he opens the door to questioning into the truth of his testimony, and the government is entitled to attack his credibility on cross-examination."  United States v. Douglas, 525 F.3d 225, 248 (2d Cir. 2008) (quotations omitted); see also United States v. Havens, 446 U.S. 620, 626-27 (1980) ("It is essential . . . to the proper functioning of the adversary system that when a defendant takes the stand, the government be permitted proper and effective cross-examination in an attempt to elicit the truth.").  The government may do so by introducing or otherwise using suppressed evidence.  Indeed, the Supreme Court has "rejected the notion that the defendant's constitutional shield against having illegally seized evidence used against him could be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances."  Havens, 446 U.S. at 626.  To the contrary, otherwise suppressed evidence—unusable by the government in its case-in-chief—is "nonetheless admissible to impeach statements made by the defendant in the course of his testimony."  See Douglas, 525 F.3d at 248 (collecting cases).  This principle extends beyond merely the defendant's testimony and also applies to argument made by the defendant.  See United States v. Djibo, No. 15-CR-88 (RJD), 2019 WL 3767045, at *2 (E.D.N.Y. Aug. 9, 2019) ("the government is precluded from using suppressed evidence 'on its direct case,' but that does not foreclose the possibility of introducing suppressed evidence for impeachment purposes where a defendant's testimony or argument relies on suppressed evidence to evade the truth"

38

(citing <u>Havens</u>, 446 U.S. at 626)) (emphasis added).  Thus, here, if the defendant opens the door

by testifying falsely or inconsistently, or advances arguments through counsel that are false, the

government should be permitted to use any suppressed evidence to impeach that testimony.[10]

## VI.  <u>THE DEFENDANT SHOULD BE PRECLUDED FROM QUESTIONING, ARGUING OR ASSERTING THAT HIS ARREST WAS UNLAWFUL OR REFERENCING THE COURT'S SUPPRESSION OF EVIDENCE</u>

The Court should preclude the defendant from questioning, arguing or otherwise

asserting or suggesting at trial that his arrest was unlawful or otherwise improper, or referencing

the Court's suppression of certain evidence at trial.  Any such questions, arguments or assertions

are irrelevant under Rule 401 because they have no bearing whatsoever on the reliability of

evidence that will be offered against the defendant.  <u>See</u> Fed. R. Evid. 401.  The Court has

already suppressed certain evidence obtained incident to the defendant's arrest and denied the

defendant's motion to suppress the defendant's post-arrest statements.  To the extent the

government admits the defendant's post-arrest statements into evidence, the Court has already

ruled that those statements were lawfully obtained and any evidence submitted by the defendant

---

[10]     Although the defendant may make argument about the absence of evidence in the
trial record, the defendant may not argue that evidence—albeit on the suppressed phone—does
not exist.  In <u>Djibo</u>, the court suppressed the contents of a phone, which contents included coded
drug messages.  The court held that Djibo could not argue that the messages on the phone did not
exist, but could argue that he was not the person who sent the messages and that there was no
evidence that he was the person who sent the messages.  <u>See</u> <u>Djibo</u>, 2019 WL 3767045, at *2
("[The defendant] may point to the <u>absence of evidence or lack of direct proof</u> that he sent the
drug trafficking messages from the [suppressed phone] in order to suggest that someone else sent
the messages or otherwise establish doubt that he was the sender.  However, [the defendant]
cannot argue that the messages <u>do not exist</u> or that the messages <u>were never sent</u>.  These latter
arguments, and any similar arguments, rely on deception.  [The defendant] can take issue with
whether or not the Government has proven, beyond a reasonable doubt, that he was the one who
sent the drug trafficking messages, but he cannot call into question (i) whether the phone or the
messages on it exist, or (ii) whether he had access to the [phone].  To do so would improperly
take advantage of the suppressed evidence by way of arguments [the defendant] knows to be
unsound.") (emphasis in the original).

regarding the lawfulness of his arrest or the lawfulness of the procurement of his post-arrest statements is thus irrelevant and contrary to the Court's prior ruling. Further, to permit the defendant to admit evidence regarding the circumstances of the defendant's arrest improperly puts the government on trial and improperly attempts to sow doubt with the jury regarding the legality of the defendant's arrest or the legality of the procurement of the defendant's post-arrest statements, neither of which is in question. Further, any remotely probative value that questions or arguments about the circumstances of the defendant's arrest may have, are substantially outweighed by all of the risks enumerated in Rule 403, including unfair prejudice, confusion of the issues, and misleading the jury, as well as undue delay and waste of time. Accordingly, the defendant should be precluded from questioning, arguing or otherwise asserting that his arrest was unlawful or otherwise improper.

## VII.    THE COURT SHOULD PRECLUDE ANY EVIDENCE INTRODUCED BY THE DEFENDANT SEEKING TO ELICIT SYMPATHY

The defendant should be precluded from commenting, introducing, or eliciting any evidence that seeks to elicit sympathy from the jury including, but not limited to, evidence concerning his personal, health, or family circumstances, or evidence of the defendant's good character through specific instances of conduct.

The Court's power to exclude arguments concerning the defendant's personal, health, or family circumstances arises from Rules 401, 402 and 403 of the Federal Rules of Evidence. The Federal Rules of Evidence also ordinarily prohibit witnesses from proving good character through specific instances of conduct. See Fed. R. Evid. 405(a). Evidence is admissible only if it is relevant—having "any tendency to make a fact [of consequence] more or less probable than it would be without the evidence," Fed. R. Evid. 401(a)—and not otherwise inadmissible, Fed. R. Evid. 402. Even relevant evidence may be excluded "if its probative value

is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury." Fed. R. Evid. 403.

"District courts have broad discretion to balance the probative value of evidence against possible undue sympathy or bias as well as prejudice." United States v. Miller, 641 F. Supp. 2d 161, 167 (E.D.N.Y. 2009). Courts have broad discretion to exclude evidence if it has "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Fed. R. Evid. 403, Adv. Comm. Notes. Indeed, when evidence is of limited probative value, it should be excluded if it has the "potential to engender sympathy in an inappropriate effort to excuse defendant's commission of the charged offenses." Miller, 641 F. Supp. 2d at 167; see also United States v. Paccione, 949 F.2d 1183, 1201 (2d Cir. 1991) (affirming preclusion of evidence that the defendant had son with cerebral palsy); United States v. Battaglia, No. 05-CR-774 (KMW), 2008 WL 144826, at *3 (S.D.N.Y. Jan. 15, 2008) (precluding "evidence of Defendant's family and personal status" as not "relevant to the issue of whether Defendant committed the crimes charged"); United States v. Harris, 491 F.3d 440, 447 (D.C. Cir. 2007) (affirming preclusion of evidence designed "mainly to cast [the defendant] in the sympathetic light of a dedicated family man").

At this time, it is unclear what evidence, if any, the defendant may seek to introduce concerning his personal, health, or family circumstances, or otherwise relating to his good character through specific instances of conduct. During the last status conference before the Court, defense counsel stated that the defendant may call witnesses to testify about the defendant's character, including potentially a rabbi. Evidence of the defendant's personal circumstances has no tendency to make any "facts of consequence" in this case more or less

probable.  Such topics simply have no bearing on whether the defendant committed the charged crimes.  Any evidence relating to these topics is irrelevant and, therefore, inadmissible.

Even assuming, arguendo, that the defendant's personal circumstances or purported good character had some limited probative value, that value would be far outweighed by the danger of unfair prejudice to the government.  Exclusion is appropriate where the admission of evidence creates "risks which range all the way from inducing decision on a purely emotional basis, at one extreme, to nothing more harmful than merely wasting time, at the other extreme."  Fed. R. Evid. 403, Adv. Comm. Notes.  The prejudice to the government resulting from the admission of evidence or argument regarding this evidence far outweighs any probative value such testimony might have.  Rather, the clear purpose for introducing evidence at trial of these details would be to elicit sympathy for the defendant or distract from the facts at issue.  The risk of juror confusion and unfair prejudice is manifest because the jury would be asked to look past the defendant's conduct in this case.  This sort of emotional appeal to the jury's sympathy should be excluded under Rule 403.  See United States v. Malpeso, 115 F.3d 155, 162-63 (2d Cir. 1997) (excluding evidence and precluding argument on issues that had "little or no relevance" to the charged crimes and might encourage jury nullification).

## VIII.  THE COURT SHOULD PRECLUDE ANY EVIDENCE OR ARGUMENTS REGARDING THE GOVERNMENT'S CHARGING DECISIONS

The government moves to preclude any reference to the fact that CC-1 has not been charged.  During the Suppression Hearing, defense counsel argued, in sum and substance, that CC-1 was responsible for the charged crime and focused heavily on law enforcement agent actions with respect to CC-1.  See Suppression Hearing Tr. 118-129; 133:14-135:2.  Based on this argument, and in an abundance of caution, the government respectfully requests that the

Court preclude the defendant from referencing during jury addresses, cross-examination or otherwise, the fact that CC-1 has not been charged.

Courts in this district routinely preclude defendants from argument related to the government's motives and charging decisions because this evidence is irrelevant and unfairly prejudicial.  See, e.g., United States v. Ramsey, No. 21-CR-495 (ARR), ECF Dkt. No. 54 at 12–13 (E.D.N.Y. Mar. 15, 2023); United States v. Hill, No. 12-CR-214 (KAM), 2014 WL 198813, at *2 (E.D.N.Y. Jan. 14, 2014); United States v. Boyle, No. 08-CR-523 (CM), 2009 WL 5178525, at *3 (S.D.N.Y. Dec. 23, 2009); United States v. Carneglia, No. 08-CR-76 (JBW), 2009 WL 185725, at *1 (E.D.N.Y. Jan. 27, 2009); United States v. Stewart, No. 03-CR-717 (MGC), 2004 WL 113506, at *1 (S.D.N.Y. Jan. 26, 2004) (granting motion to preclude the defendant from "presenting arguments or evidence that would invite the jury to question the Government's motives in investigating and indicting" the defendant).

The government's motives and charging decisions are irrelevant to the defendants' guilt or innocence.  Whether a co-conspirator has to date been charged does not make it more or less probable that the defendant engaged in the alleged conspiracy.  Moreover, there are many considerations that influence whether and when a prosecuting authority may decide to bring charges against a particular individual, including timing issues, resources and other issues particular to that individual's case.  See United States v. Inniss, No. 18-CR-134 (KAM), 2019 WL 6999912, at *6 (E.D.N.Y. Dec. 20, 2019).  Because this evidence is irrelevant, it serves only to appeal to the jury's sympathies by creating a (false) appearance of unfairness and invites nullification and should be precluded pursuant to Rule 403.  See Fed. R. Evid. 403; cf. United States v. Thomas, 116 F.3d 606, 614 (2d Cir. 1997) ("Nullification is, by definition, a violation of a juror's oath to apply the law as instructed by the court—in the words of the standard oath to

43

jurors in the federal courts, to render a true verdict according to the law and the evidence.  We categorically reject the idea that, in a society committed to the rule of law, jury nullification is desirable or that courts may permit it to occur when it is within their authority to prevent.") (internal quotation marks and citation omitted; emphasis in original).

IX.    THE COURT SHOULD PRECLUDE ANY EVIDENCE RELATING TO POSSIBLE PUNISHMENT AND COLLATERAL CONSEQUENCES

The Court should preclude the defendant from mentioning any consequences of his conviction during jury addresses, cross-examination or otherwise.  While the defendant has not suggested that he intends to introduce any discussion of such consequences at trial, out of an abundance of caution, the government moves to preclude any discussion of such evidence.

Evidence regarding possible consequences the defendant may face if convicted should be precluded because it is not relevant.  As stated above, "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  Fed. R. Evid. 401.  The defendant's punishment is not a fact "of consequence" to be determined at trial.  Therefore, any evidence of those issues is not relevant.  See Shannon v. United States, 512 U.S. 573, 579 (1994) ("Information regarding the consequences of a verdict is . . . irrelevant to the jury's task.").

Such evidence is not only irrelevant, but it "invites [jurors] to ponder matters that are not within their province, distracts them from their fact-finding responsibilities, and creates a strong possibility of confusion."  Id.  Indeed, jurors are routinely instructed not to consider a defendant's punishment in determining a defendant's guilt.  See generally Sand, et al., Modern Federal Jury Instructions ("Sand"), Instruction 9-1 (2017 ed.); see also Shannon, 512 U.S. at 579 (a jury "should be admonished to reach its verdict without regard to what sentence might be imposed [and] not to consider the consequences of their verdicts . . . ." (internal citation

44

omitted)); United States v. Watts, 934 F. Supp. 2d 451, 464-65 (E.D.N.Y. 2013) ("[I]t is well-established precedent that jurors should not be informed about the possible consequences of their verdict, due to the likelihood that prejudice, unfairness, and confusion [] would result.").

Courts have routinely precluded evidence of the potential sentences defendants face on the grounds that such evidence is irrelevant, unfairly prejudicial and outside the province of the jury. See, e.g., United States v. Blume, 967 F.2d 45, 49 (2d Cir. 1992) ("Federal courts usually instruct juries not to consider a verdict's consequences"); United States v. Lewis, 110 F.3d 417, 422 (7th Cir. 1997) (holding that district court correctly refused to permit defendant to argue about the severity of his possible punishment); United States v. DiMarzo, 80 F.3d 656, 660 (1st Cir. 1996) (district court "soundly excluded" evidence of a potentially harsh sentence because such evidence "would have necessitated an unwarranted departure from the fundamental division of responsibilities between judge and jury"). In short, guilt should determine punishment, not the other way around. See Thomas, 116 F.3d at 614. Courts have consistently recognized that juries have no right to nullify, and "trial courts have the duty to forestall or prevent such conduct." Id. at 616. Therefore, the Court should preclude the defendant from referencing potential punishment and collateral consequences at trial.

X.    THE DEFENDANT MUST DISCLOSE WITNESS STATEMENTS UNDER FED. R. CRIM. P. 26.2

The government respectfully requests that the Court order the defendant to disclose the statements of any defense witnesses other than the defendant pursuant to Federal Rule of Criminal Procedure 26.2, on the date currently set for the government to exchange material pursuant to Title 18, United States Code, Section 3500—i.e., October 17, 2025. See

United States v. Boustani, No. 18-CR-681 (WFK), ECF No. 120 at 1-2 (E.D.N.Y. July 31, 2019) (ordering simultaneous exchange of Rule 26.2 material).[11]

        Further, to avoid any unnecessary objections or delays during opening statements, the government respectfully requests that the Court order that the parties mutually exchange any demonstratives each party intends to use during opening statements no later than October 29, 2025.  See United States v. Aguilar, No. 20-CR-390 (ENV), ECF No. 238 at 1-2 (E.D.N.Y. Jan. 2, 2024) (ordering exchange of opening-statement demonstratives after completion of jury selection).  The government respectfully submits that such demonstratives should not include any exhibits, as exhibits generally may not be shown to the jury during opening statements. See id. at 1 ("Aguilar may not during his opening statement show or reference by exhibit number exhibits marked for use at trial."); Williams v. Vahey, No. 20-CV-2560 (KAM), 2023 WL 130834, at *1 (E.D.N.Y. Jan. 8, 2023).

---

[11]    The government's request is limited to disclosure of material under Fed. R. Crim. P. 26.2 because the Court has already ordered the parties to exchange exhibits 14 days before trial—i.e., October 20, 2025.  See June 25, 2025 Minute Entry.  This should include documents the defendant intends to use during the government's case-in-chief (but not those documents to be used for impeachment purposes only).  See United States v. Napout, No. 15-CR-252 (PKC), 2017 WL 6375729, at *7 (E.D.N.Y. Dec. 12, 2017) (holding that "Rule 16 requires Defendants to identify all non-impeachment exhibits they intend to use in their defense at trial, whether the exhibits will be introduced through a government witness or a witness called by a Defendant.").

CONCLUSION

For the foregoing reasons, the Court should grant the government's motions in

limine in their entirety.

Dated:       Brooklyn, New York
             August 8, 2025

                                        Respectfully submitted,

                                        JOSEPH NOCELLA, JR.
                                        UNITED STATES ATTORNEY
                                        Eastern District of New York
                                        271 Cadman Plaza East
                                        Brooklyn, New York 11201

                             By:     /s/
                                        _____
                                        Megan Larkin
                                        Benjamin Weintraub
                                        Assistant United States Attorneys
                                        (718) 254-7000


Cc:          Clerk of the Court (DLI) (by ECF)
             Counsel of Record (by ECF)

47