DR:ML/BW
F. #2022R00580

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

       - against -                      Docket No. 23-CR-99 (DLI)

SHLOMO PATCHIAV,
       also known as "Slava Fatkhiev,"

               Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - -X

## SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF THE GOVERNMENT'S MOTIONS IN LIMINE

JOSEPH NOCELLA, JR.
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Megan Larkin
Benjamin Weintraub
Assistant U.S. Attorneys
    (Of Counsel)

PRELIMINARY STATEMENT

Pursuant to the Court's November 4, 2025 order, see Minute Entry dated Nov. 5, 2025, the government respectfully submits this supplemental memorandum of law in support of its motions in limine.  In its opening motions in limine, the government moved to introduce evidence of the victim Shehroz Tokhirov's (the "Victim") disappearance, murder and the disposal and recovery of his body as both direct evidence and under Federal Rule of Evidence 404(b).  See ECF No. 96 ("Gov't Mot." or "Government's Opening Motion") at 9-19.  Since the submission of the Government's Opening Motion, the government obtained additional DNA evidence linking the defendant to the Chevrolet Malibu (the "Chevy Malibu") that was used to transport the Victim to a residence in Ellenville, New York (the "Ellenville Residence"), where his body was later found.  This new evidence bolsters the defendant's ties to his co-conspirator Sanat Djumayev ("CC-1") and to the Victim's disappearance, murder and the disposal of his body within hours of the Victim handing over his money and property to CC-1.  Further, it undermines the defendant's oft-repeated argument that he had nothing to do with the charged conspiracy and Victim's disappearance, and had only a passing, coincidental acquaintance with CC-1.  As such, for the reasons stated herein and in the Government's prior motions, the Court should admit evidence of the Victim's disappearance, murder and the disposal and recovery of his body.  See Gov't Mot., ECF No. 101 ("Gov't Opp." or "Government's Opposition"), ECF No. 104 ("Gov't Reply" or "Government's Reply").

BACKGROUND

The government incorporates by reference the statement of facts set forth in the Government's Opening Motion, see Gov't Mot. at 2-7, and recounts below only those facts that are relevant to the newly-obtained evidence that is the focus of this supplemental memorandum.

As discussed in the Government's Opening Motion, on June 25, 2022, the day of the Victim's disappearance after giving CC-1 money and property, CC-1 purchased the Chevy Malibu and two dark-colored duffle bags.  Id. at 4.  On June 26, 2022, CC-1 hired a tow truck to tow the Chevy Malibu from Brooklyn to the Ellenville Residence.  Id. at 5.  At approximately the same time as the tow truck towed the Chevy Malibu to Ellenville, the defendant and CC-1 drove together to the Ellenville Residence.  Id.  Five days later, on July 1, 2022, law enforcement agents seized the Chevy Malibu, which had been parked at the Ellenville Residence.  Id. at 6.  During a subsequent search of the Chevy Malibu, tools and a baseball hat were recovered from the Chevy Malibu's trunk.  Id.  On February 21, 2023, law enforcement agents recovered two dark-colored duffle bags containing the Victim's body from a pile of junk and debris in a wooded area behind the Ellenville Residence.  Id. at 7.

DNA testing was conducted on various parts of the Chevy Malibu and its contents. As previously disclosed, traces of the Victim's DNA and blood were found on some of the tools located in the Chevy Malibu's trunk and on the vehicle's rear trim.  Id. at 6.  Since the submission of the Government's Opening Motion, a comparison of a buccal sample taken from the defendant and DNA recovered from various items recovered from the Chevy Malibu's trunk, including the baseball hat, was conducted pursuant to a judicially authorized search warrant.  See 25-MC-3559. The results of the comparison (the "DNA Report") were produced to the defendant on the same day the government received the report.  The DNA Report indicates that traces of the defendant's DNA were found on the baseball hat that was recovered from the Chevy Malibu's trunk.

## ARGUMENT

The Government's Opening Motion set forth the bases pursuant to which evidence of the Victim's disappearance, murder and the disposal and recovery of his body is admissible as

both direct evidence and under Rule 404(b).  See Gov't Mot. at 9-18.  In brief, this evidence is admissible as direct evidence because (i) the defendant and CC-1's use of actual violence against the Victim is probative of their antecedent use of threats of violence; (ii) it is inextricably intertwined with and completes the story of the charged conspiracy; (iii) it is probative of the relationship of trust between the defendant and CC-1; and (iv) it is probative of the defendant's consciousness of guilt.  See id. at 11-16.  It is also admissible under Federal Rule of Evidence 404(b) as evidence of the defendant and CC-1's planning and preparation, knowledge and intent, and absence of mistake or accident.  Id. at 16-18.

The newly-obtained DNA Report—which establishes that the defendant's DNA was found on the baseball hat recovered from the trunk of the Chevy Malibu where the Victim's blood was found and within which the Victim was transported to the Ellenville Residence—bolsters the arguments already advanced in the Government's Opening Motion.  As detailed in the Government's Opening Motion, the charged extortion conspiracy largely occurred in the days leading up to and during the weekend of June 25-26, 2022.  After days of receiving repeated threats and demands for money by the defendant and CC-1, on June 25, 2022, the Victim left his apartment—never to return—with a bag of cash and went with CC-1 to a bank and notary where he turned over more money and signed over property to CC-1.  CC-1 purchased the Chevy Malibu at approximately 5:00 p.m. the same day.  Hours later, in the early morning hours of June 26, 2022, the defendant and CC-1 took possession of the Victim's car and, later that same morning, CC-1 arranged for a tow truck to tow the Chevy Malibu to the Ellenville Residence.  The defendant and CC-1 drove together to the Ellenville Residence, arriving around the same time as the tow truck carrying the Chevy Malibu.  The defendant then left CC-1 at the premises and went with the

3

homeowner of the Ellenville Residence to buy groceries for approximately 1.5 hours.  Upon arriving back, the defendant abruptly left with CC-1.

Given that the Chevy Malibu was purchased on the same day as the extortion and disappearance, the only opportunity for the defendant to put his baseball hat in the Chevy Malibu would have been on the same day, prior to the Chevy Malibu being towed to the Ellenville Residence.  Therefore, the newly-obtained DNA evidence directly ties the defendant to the Chevy Malibu within hours of the Victim being removed from the trunk the next morning.  This establishes that the defendant had access to the Chevy Malibu—the vehicle used to transport the Victim to the Ellenville Residence—and that CC-1 was not the only one with access.  The location of the baseball hat in the trunk also establishes that the defendant had access to the trunk of the Chevy Malibu, where the Victim's blood was found.  Thus, the presence of the defendant's DNA on the baseball hat located in the same exact location as the Victim is direct evidence linking the defendant to the Victim's disappearance on the same day the Victim handed over his money and property to CC-1.  These direct ties strengthen the government's other evidence establishing that the defendant was a knowing participant in and took affirmative steps in furtherance of the conspiracy through, among other things, threatening the Victim in the days preceding his disappearance and, in concert with CC-1, taking possession of the Victim's vehicle in the early morning of June 26, 2022.  The newly-discovered evidence linking the defendant to the Chevy Malibu trunk also further explains the relationship of trust and closeness between the defendant and CC-1 because it establishes that CC-1, who purchased the Chevy Malibu, was in communication with the defendant and gave him access to the Chevy Malibu on the day of the extortionate conduct. Further, the DNA evidence strengthens the government's argument that the defendant followed through with his threats of force against the Victim in the course of the

4

conspiracy because it links the defendant to a location within which the Victim's blood was found on the day of the extortion and disappearance.

This newly-obtained evidence also strongly rebuts the defendant's oft-repeated arguments that he had only a superficial relationship with CC-1 and was only involved in the disposal of the Victim's body by happenstance. See, e.g., ECF No. 105 ("Def. Reply") at 3. In the defendant's motions in limine, see ECF No. 95, and reply to the government's opposition to his motions in limine, see Def. Reply, the defendant repeatedly argues that he had no involvement in the extortion conspiracy or in the Victim's disappearance, murder or disposal of the Victim's remains in Ellenville. Specifically, in his reply brief, the defendant contends that the government has failed to establish that the defendant entered into a conspiracy with CC-1, and that the evidence instead merely

> demonstrates that the [d]efendant had at best a passing acquaintance with [CC-1] and the [V]ictim which resulted in [the defendant] loaning his brother's car to [CC-1] who may have used it for unauthorized purposes about which [the defendant] had no knowledge while [the defendant] observed the Jewish Sabbath. The [d]efendant then provided a ride to [CC-1] on June 26, 2025, to a location in Ellenville, New York previously unknown to him in exchange for five hundred dollars.

Def. Reply at 2-3. The defendant then asks the Court to preclude evidence of CC-1's "terrible crimes," in which the defendant claims to have had no involvement. Id. at 3. However, the evidence contained in the DNA Report strongly rebuts that narrative, as it cements the defendant's place in the conspiracy by placing the defendant in close proximity to the Victim's body on June 25-26, 2022—including in the trunk within which the Victim's blood was found—and rebuts the defendant's argument that he had no idea what was in the Chevy Malibu trunk when it was towed to the Ellenville Residence and that he had no idea what CC-1 was doing while the defendant and

5

the Homeowner went shopping, i.e., removing the Victim from the Chevy Malibu trunk and disposing of him inside the duffle bags in the trash pile behind the Ellenville Residence.

The defendant also argues that evidence relating to the Victim's disappearance, the fact of his murder and the disposal and recovery of his body is unduly prejudicial under Federal Rule of Evidence 403. See Def. Reply at 3. As detailed in the Government's Opposition at 11-17, the probative value of this evidence is not substantially outweighed by the danger of unfair prejudice simply because a murder is involved. In United States v. De Parias, for example, the Eleventh Circuit affirmed the district court's decision to admit evidence of a murder where murder was not charged. 805 F.2d 1447 (11th Cir. 1986). Two defendants charged with Hobbs Act extortion and extortion conspiracy—but not murder—argued on appeal that evidence of autopsy photographs showing the victim's "badly decomposed corpse" should have been excluded as unduly prejudicial. Id. at 1453. In the case, the defendants and their co-conspirators kidnapped the victim for ransom after the victim's father insulted the defendant's sister. Id. at 1449. Although the victim's father agreed to pay $1,000,000 in ransom money, after several unsuccessful attempts to drop off the money, one of the defendants killed the victim by wrapping his head in duct tape and beating his head with a chinning bar as he suffocated and then buried the victim in a ditch. Id. at 1449-50. The Eleventh Circuit held that the district court did not abuse its discretion in permitting the government to show autopsy photographs of the deceased victim's body because the photographs identified the victim and means of death, and corroborated testimony of a medical examiner scheduled to testify in the case. Id. at 1454. The Court acknowledged that, though photographs of homicide victims can be extremely prejudicial, Federal Rule of Evidence 403 should be sparingly used. Id. Thus, even where the defendants were not charged with murder, the

6

court permitted evidence of the fact of the murder itself and photographs of the deceased victim's remains as evidence of the charged extortion and conspiracy.

As further stated in the Government's Opposition, the result in De Parias is in line with other decisions in which courts have acknowledged that acts taken subsequent to charged conduct are frequently probative of intent, see Gov't Opp. at 7-9, 12-14, and have permitted evidence of conduct more violent than the charged conduct, including in prosecutions for threats, firearms possession and narcotics conspiracies.  Id. at 15-17; see, e.g., United States v. Ulbricht, 79 F. Supp. 3d 466, 487 (S.D.N.Y. 2015) (admitting evidence that defendant charged with non-violent, narcotics-related crimes related to his operation of an online marketplace for illicit goods and services had solicited six murders-for-hire in an effort to protect the business even though it "inject[ed] an element of violence into the case" because such efforts were probative of the existence of the unlawful conspiracy).  Indeed, like in Ulbricht, the evidence here establishes affirmative actions taken by the defendant to further the charged extortion conspiracy by, in addition to the other conduct listed above, protecting and ensuring that their extortion efforts were successful and limiting threats of exposure to law enforcement.  While such evidence may be prejudicial, such prejudice does not substantially outweigh its significant probative value which directly links the defendant to the charged conspiracy.

In sum, as set forth above, evidence of the defendant's and CC-1's actions related to the Victim's disappearance and disposal of his body—which occurred on the day they collected the Victim's money and property pursuant to extortionate threats, including evidence that ties the defendant to the trunk of the car carrying the Victim to the Ellenville Residence—has significant probative value to a number of critical issues in the case, including the existence of the charged conspiracy and the defendant's knowing involvement in it.  Further, any potential prejudice is

7

circumscribed by the limited nature of the evidence of the circumstances of the Victim's death. Indeed, as noted in the Government's Opposition at 11-12, the government does not intend to introduce evidence about the specifics of the Victim's death other than the fact of his death by gunshot while wearing clothing he wore when he left his apartment on June 25, 2022, and where and how his body was discovered, because, as noted above, those facts are highly probative of the existence of the charged conspiracy and are necessary to complete the story of the charged conspiracy. Ultimately, because the significant probative value of this evidence is not substantially outweighed by any prejudicial effect, the government respectfully submits that such evidence is admissible at trial.

## CONCLUSION

For the foregoing reasons, the Court should grant the government's motions in limine and deny the defendant's motions in limine in their entirety.

Dated:    Brooklyn, New York
          December 2, 2025

Respectfully submitted,

JOSEPH NOCELLA, JR.
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

By:    /s/ Megan Larkin
       Megan Larkin
       Benjamin Weintraub
       Assistant U.S. Attorneys
       (718) 254-6248

8