UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
UNITED STATES OF AMERICA,    :

    :       **OPINION AND ORDER**

   -against-    :       **23-cr-99 (DLI)**

    :

SHLOMO PATCHIAV,    :

    :

       Defendant.    :
--------------------------------------------------------x

**DORA L. IRIZARRY, United States District Judge:**

Defendant Shlomo Patchiav ("Defendant") is charged by indictment with conspiracy to commit extortion in violation of 18 U.S.C. §§ 1951(a) and 3551. *See*, Indictment, Dkt. Entry No. 8. Defendant moved to suppress evidence obtained by the Government from his cellular device (the "Cellphone") and the statements he made while in custody following his warrantless arrest. *See*, Att'y Aff. Support of Mot. Suppress, Dkt. Entry No. 37; Mem. Support of Mot. Suppress, Dkt. Entry No. 37-1 ("Mot."); Patchiav Aff., Dkt. Entry No. 37-2; Khaimova Aff., Dkt. Entry No. 37-3. The Government opposed the motion. *See*, Gov't Mem. Opp'n ("Opp'n"), Dkt. Entry No. 42. Defendant replied. *See*, Att'y Aff. Reply ("Reply"), Dkt. Entry No. 44.

A suppression hearing was held on November 21, 2024 and February 14, 2025. After the hearing, Defendant filed a post-hearing memorandum in further support of his motion to suppress. *See*, Post-Hr'g Mem. in Support of Mot. ("PH Mem."), Dkt. Entry No. 77. The Government responded. *See*, Post-Hr'g Opp'n Mem. ("PH Opp'n"), Dkt. Entry No. 84. Defendant replied. See, Post-Hr'g Reply Mem. ("PH Reply"), Dkt. Entry No. 88. For the reasons set forth below, Defendant's motion is granted as to the evidence obtained from the Cellphone and denied as to his post-arrest statements.

## I.    Findings of Credibility

At the suppression hearing, the Government presented testimony from Special Agent Daniel Sepe ("S/A Sepe"), Special Agent Jarrett Concannon ("S/A Concannon"), and Supervisory Special Agent Ryan Serkes ("Supv. S/A Serkes") from the Federal Bureau of Investigation ("FBI").  The Court finds these witnesses credible.  The defense did not call any witnesses in support of its motion and Defendant did not testify.

## II.    Findings of Fact

On June 25, 2022, an individual ("Victim") went missing from Brooklyn, New York. Compl. ¶ 3, Dkt. Entry No. 1; Opp'n, Ex. C, Appl. Search Warrant for Electronic Device ("Cellphone Warrant"), Dkt. Entry No. 42-3, ¶ 6.  The FBI formed a case team to investigate Victim's disappearance, which included S/A Concannon, S/A Joe Loecher, S/A Alan Fowler, and Customs and Border Protection ("CBP") Officer Brian Beck (the "Case Team").  PH Opp'n, Ex. A., Suppression Hr'g Tr. ("Tr."), Dkt. Entry No. 84-1 at 119:1-8.  During its investigation, the Case Team discovered that Victim previously had met with Defendant and his coconspirator ("Coconspirator") to discuss a possible sale of high-end watches.  Compl. ¶ 5; Cellphone Warrant ¶ 7; Tr. at 78:7-13.  Thereafter, Defendant and Coconspirator allegedly demanded that Victim pay them approximately $500,000 for the watches, and threatened to harm him should he fail to comply.  Compl. ¶ 5; Cellphone Warrant ¶ 8; Tr. at 78:14-79:21, 80:1-6.

On June 25, 2022, Victim purportedly met with Coconspirator to provide payment in cash and by check, as well as to transfer of ownership of Victim's Mercedes GLS 550 (the "Mercedes"). Compl. ¶ 6; Cellphone Warrant ¶¶ 9-11; Tr. at 78:14-80:19.  The record is unclear as to exactly how much cash Victim gave to Coconspirator.  *See*, Tr. at 79:14-21 (S/A Concannon's testimony that "[Defendant and Coconspirator] were going to accept payment of . . . $200,000 in cash and .

2

. . another check that was taken out of [Victim's] bank account"); *Id.* at 80:15-19 (S/A Concanon's testimony that video footage showed Victim leaving his house "with a bag of cash"); Compl. ¶ 6 ("Victim planned to provide [Coconspirator]" with "approximately (i) $100,000 in cash[;] [and] (ii) approximately $30,000 from [his] bank account"); *Id.* ¶ 8 ("[Victim] issued a bank check to [Coconspirator] for approximately $20,000 from [Victim's] TD Bank account and also withdrew approximately $10,000 in U.S. currency from that account."); Cellphone Warrant ¶ 11 (same). That same day, Coconspirator purchased a Chevrolet Malibu (the "Malibu") from a car dealership as well as multiple dark colored duffle bags. Compl. ¶¶ 9-10; Cellphone Warrant ¶¶ 12-13; *See*, Tr. at 67:22-68:2, 81:6-81:17. The next day, on June 26, 2022, a tow truck was hired by an unknown caller to tow the Malibu to a residence in Ellenville, New York ("Ellenville Property"), which is two hours away from New York City. Compl. ¶ 12; Cellphone Warrant ¶ 15, Tr. at 81:19-82:6, 168:11-14. Defendant and Coconspirator followed the truck towing the Malibu to the Ellenville Property. Tr. at 66:18-25, 82:3-83:11.

On June 27, 2022, Coconspirator purchased a ticket for a flight departing on June 28, 2022 from John F. Kennedy International Airport to the Republic of Georgia. Compl. ¶ 14; Cellphone Warrant ¶ 17. While at the airport, he was stopped and interviewed on the bridgeway to the plane by S/A Concannon and a CBP agent. Compl. ¶ 15; Cellphone Warrant ¶ 18; Tr. 112:23-114:2, 115:22.. Coconspirator told the agents that he and Defendant gave Victim watches to sell, and that Victim owed him money for those watches. Compl. ¶ 15; Cellphone Warrant ¶ 18; Tr. 112:23-114:2. He also told them that he had $20,000 on his person, which was derived from his business transactions with Victim. Tr. at 114:117:4. He admitted that the currency was not properly declared to customs. *Id.* The law enforcement agents searched Coconspirator's cellular device, where they found communications with Victim prior to his disappearance. Compl. ¶ 16; *See*, Tr.

at 86:10-19.  They also found communications with Defendant, including references to the money owed by Victim, a photo of a notarized document purportedly transferring ownership of the Mercedes to Coconspirator, and a video of a "large quantity of cash."  Compl. ¶ 16; Cellphone Warrant ¶¶ 19-20; *See*, Tr. at 86:10-19.  Coconspirator then was permitted to board his flight and leave the United States.  *See*, Tr. at 118:8-14.  The Case Team subsequently searched the Ellenville Property and the Malibu, which was still parked there.  Compl. ¶¶ 18-19; Tr. at 83:13-84:13.  In the Malibu, the officers located a lug wrench, pliers, and a vehicle jack, on which Victim's blood allegedly was found.  Compl. ¶ 18; Cellphone Warrant ¶ 21; *See*, Tr. at 128:10-13.

On February 21, 2023, the Case Team discovered Victim's remains in two duffle bags behind the Ellenville Property.  Compl. ¶ 19; Cellphone Warrant App. ¶ 22.  The duffle bags appeared consistent in appearance to those purchased by Coconspirator.  Compl. ¶ 19; Cellphone Warrant App. ¶ 22.  While the investigation had been covert, local media and neighbors were "interested in [the officers'] presence" at the Ellenville Property.  Tr. at 51:18-53:4, 62:1-7.  This caused law enforcement to believe that the investigation might become overt, and that Defendant might flee.  *Id.*  S/A Serkes, who was not part of the Case Team and knew little about the investigation, was asked to draft the operations order, which laid out a plan to arrest Defendant the following day since the entire Case Team was out in the field.  Tr. at 54:22-55:23, 167:8-168:14.  He did so, "covering" for the Case Team while they were in Ellenville.  *Id.*  A complaint against Defendant was drafted later that day, but the Case Team waited until normal business hours the following day to "swear [the complaint] out" before a judge.  *Id.* at 62:3-63:15, 185:14-22.  S/A Concannon testified that he reviewed the complaint before it was sworn to.  *Id.*

At approximately 5:00 a.m. the next morning, February 22, 2023, the Case Team, including S/A Concannon, held a pre-arrest meeting with members of the FBI's Special Weapons and Tactics

4

"(SWAT") team, including S/A Sepe and Supv. S/A Serkes. Tr. at 10:25-11:5, 54:10-24, 173:3-8. The attendees discussed the background of the case and the plan for the arrest operation, and reviewed the operations plan prepared by S/A Serkes. Tr. at 10:25-11:5, 54:10-24, 172:13-14.

While it is undisputed that no arrest warrant was ever executed for Defendant, it unclear from the record whether anyone at the meeting falsely stated one existed. *See*, Tr. at 51:2-3. In any event, there was significant confusion among the law enforcement officers as to whether there was a signed arrest warrant. The night before the arrest, S/A Serkes sent an email to the team that was assembled to conduct the arrest operation stating that they were to "execut[e] [the] arrest warrant." Gov't Ex. 3500-DS-2. However, S/A Serkes testified that he did not recall sending that email and S/A Sepe testified that he did not recall receiving it. *See*, Tr. 33:20-36:24, 184:16-185:1. S/A Concannon testified that, at the time of the arrest, he was aware that there was no arrest warrant and believed that the participants of the pre-arrest meeting had the same understanding. *Id.* at 64:5-24. S/A Sepe testified that a case agent informed the SWAT team during the pre-arrest meeting that there was a signed arrest warrant and that they were to arrest Defendant at his residence (the "Residence") based on that warrant. Tr. at 11:9-11; 23:17-24:4, 26:4-27:4. He also testified that, "due to the exigency" of the situation, the SWAT team relied on the "verbal assertion of a warrant" in deciding to execute a plan where they would breach the front door if they were not permitted to enter the Residence after they knocked on the door and announced themselves. *See*, Tr. at 24:1-4, 27:15-25. Supv. S/A Serkes testified that the Case Team informed him that there was a signed arrest warrant. Tr. 171:19-24, 1954:25-195:12.

At approximately 6:00 a.m., a group of at least ten law enforcement officers arrived at the Residence to arrest him. Patchiav Aff. ¶ 4, Tr. at 54:2-57:16, 173:3-24. This group was comprised of FBI special agents, members of the Case Team, and members of the SWAT team. Tr. at 173:17-

5

24.    Members of the SWAT team pounded on the Residence's front door and announced themselves. *Id.* at 15:9-10.  The SWAT team then forced open the door using a breaching tool, damaging the door and door frame.  Tr. at 15:20-16:16; Khaimova Aff. ¶ 7.

Defendant, barefoot and wearing what appeared to be sleepwear, was ordered to the front door, arrested, and handcuffed by an officer, who brought him outside.  Tr. at 16:17-18:4, 56:18-57:11; 176:14-177:14.  Before being taken to the FBI field office, Defendant indicated that he wished to change into clothing appropriate for winter, which was in a room on the first floor of the Residence. *Id.* at 18:2-21:16, 58:8-23.  Members of the SWAT team conducted a protective sweep of the first floor and law enforcement agents, including S/A Concannon and S/A Serkes, escorted Defendant to that room to get changed. *Id.*  S/A Serkes testified that upon entering the room, an alarm began ringing on a cell phone located on a couch. *Id.* at 178:19-179:6.  He stated that Defendant confirmed that it was his phone, he turned the alarm off, and then returned it to the couch. *Id.*  S/A Concannon testified that law enforcement officers seized the Cellphone and Defendant gave them the combination to unlock it. *Id.* at 58:24-59:7.  The officers took the Cellphone back to their field office, where it "sat" for approximately two weeks. *Id.* 59:14-19.  All communications between Defendant and the law enforcement officers were conducted in English. *Id.* at 19:3-6; 94:25-95:12.

Defendant subsequently was taken to the FBI's New York City field office to be processed. *Id.* at 86:20-87:2.  There, he was questioned by S/A Concannon and Officer Beck in English. *See*, GX-2, Video and Audio Recording of Def.'s Interrogation at 0:00:35-0:00:40 ("Video").  Defendant was read his *Miranda* rights and he read and signed an "Advice of Rights" form, both in English, consenting to be interviewed without a lawyer present. *Id.* at 0:02:24-0:03:40; GX-1, Advice of Rights Form.  Defendant requested that the charges against him be translated to Hebrew.

Video at 0:00:55-0:00:59.  The officers attempted to use Google Translate to translate the charges, but could not accommodate the request as the room did not have cellular service.  *Id.* at 0:01:22-0:02:00.  The interview proceeded and lasted for approximately 90 minutes.  Defendant indicated on three occasions that he did not wish to respond to questioning.  *Id.* at 0:30:23-0:30:34, 0:42:55-0:43:14, 0:44:56-0:45:23.  In each instance, the officers continued to ask Defendant questions, which he responded to.  *See*, Video at 0:30:29-0:30:39, 0:42:55-0:43:14, 0:44:56-0:45:23.

Later that day, a complaint charging Defendant with extortion conspiracy in violation of 18 U.S.C. § 1951(a) was filed and sworn to before the Hon. Cheryl L. Pollak, U.S. Magistrate Judge of this Court.  *See*, Compl.; Tr. 63:6-15. Approximately two weeks later, on March 6, 2023, Defendant was indicted by a grand jury.  *See*, Indictment, Dkt. Entry No. 8.  On March 15, 2023, the Hon. Vera M. Scanlon, U.S. Magistrate Judge of this Court, issued a search warrant for the Cellphone, which had been in the FBI's custody since Defendant's arrest.  *See*, Cellphone Warrant; Tr. 59:13-19.  The Cellphone Warrant contained: (1) an affidavit by S/A Concannon explaining the basis for probable cause to search the Cellphone; (2) a document describing the Cellphone; and (3) a document listing six categories of items to be seized in connection with designated crimes. *See generally*, Cellphone Warrant.

Defendant now moves to suppress evidence obtained from the Cellphone, as well as statements he made after he was arrested, based on alleged violations of the Fourth and Fifth Amendments.[1]  He contends that the Cellphone evidence and post-arrest statements are inadmissible because they are "fruit of the poisonous tree," as they were obtained as a result of the

---

[1] In his motion, Defendant stated that law enforcement officers also violated his Sixth Amendment rights during his interrogation.  *See*, Mot. at 3; Patchiav Aff. ¶ 2.  However, this allegation is neither further argued in the motion, nor raised in subsequent briefs.  "When a party fails to adequately present arguments in a brief, a court may properly consider those arguments abandoned."  *Malik v. City of New York*, 841 F. App'x 281, 284 (2d Cir. 2021) (summary order) (quotation marks and citation omitted).  Accordingly, any claim that the Government violated Defendant's Sixth Amendment rights is deemed abandoned.

Government's warrantless search and seizure of Defendant's person and effects.  Mot. at 6-7.  The Government concedes that the FBI forcibly entered Defendant's home and arrested him without a warrant.  *See*, Opp'n at 1.  However, the Government counters that the evidence obtained from the Cellphone is admissible pursuant to the: (1) inevitable discovery doctrine, arguing that it inevitably would have discovered the Cellphone, as it was central to Defendant's alleged crimes; and (2) doctrine of good faith, as it applied for and received a warrant before searching the Cellphone.  *See*, Opp'n at 9-16.  Moreover, the Government contends that the statements are admissible because there was probable cause to arrest Defendant, who "knowingly and voluntarily waived his Miranda rights."  *Id.* at 18-24.

### III.    Legal Standard and Analysis

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  "At the Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'"  *Florida v. Jardines*, 569 U.S. 1, 6 (2013) (citation omitted).  This protection extends to the area belonging to and immediately surrounding the home, or the curtilage.  *Id.* at 6-7 (citation omitted) (noting that the curtilage includes the front porch).  Accordingly, warrantless searches of and seizures made in or immediately surrounding the home are "presumptively unreasonable," even if conducted with probable cause.  *Payton v. New York*, 445 U.S. 573, 603 (1980).

Law enforcement only may intrude on this constitutionally protected area physically if they are granted license to enter by the homeowner, or if "exigent circumstances" permit them to do so.  *Kentucky v. King*, 563 U.S. 452 (2011) (internal quotation marks and citations omitted) (discussing exigent circumstances); *Jardines*, 569 U.S. at 8 (citation omitted) (discussing license to enter).

Lacking a warrant, officers "may approach a home and knock," as this is what any member of the public might do. *Jardines*, 569 U.S. at 8. However, officers may not summon a suspect to the door of a home to conduct a warrantless "across the threshold" arrest. *United States v. Allen*, 813 F.3d 76, 85 (2d Cir. 2013) ("[I]irrespective of the location or conduct of the arresting officers, law enforcement may not cause a suspect to open the door of the home to effect a warrantless arrest of a suspect in his home in the absence of exigent circumstances."). Here, the Government concedes that law enforcement officers entered the Residence to arrest Defendant without a warrant, exigent circumstances, or license to enter. *See*, Tr. 51:2-3. Therefore, Defendant's arrest amounts to an indisputable and egregious violation of his Fourth Amendment Rights.

However, the Government asserts that seizure of the Cellphone was legal because law enforcement had consent to enter the Residence. They argue that after he was arrested, Defendant provided law enforcement with license to enter the Residence by allowing them to escort him inside to change clothes, where they found the Cellphone "in plain view." Post Hearing Opp'n at 22 (citations omitted). That argument is fundamentally flawed. Even if Defendant's consent to be escorted inside constituted after-the-fact consent to enter the Residence, such consent, and the subsequent seizure of the Cellphone, would be "too closely connected in context and time to the illegal arrest to break the chain of illegality." *United States v. Ceballos*, 812 F.2d 42, 49-50 (2d Cir. 1987); *See also*, *Horton v. California*, 496 U.S. 128, 136-37 (1990) ("It is, of course, an essential predicate to a valid warrantless seizure of incriminating evidence that the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed."). Therefore, it would remain tainted by the initial unlawful entry and arrest. Accordingly, the Government's seizure of the Cellphone also was presumptively unreasonable and in flagrant violation of Defendant's Fourth Amendment rights.

9

## A.    Cell Phone Evidence

The Supreme Court has established an "exclusionary rule that, when applicable, forbids the use of improperly obtained evidence at trial." *Herring v. United States*, 555 U.S. 135, 139 (2009) (citation omitted). The purpose of this rule is to "deter future unlawful police conduct" and safeguard Fourth Amendment rights. *United States v. Calandra*, 414 U.S. 338, 347 (1974). However, as an exception to the exclusionary rule, the inevitable discovery doctrine provides that unlawfully seized evidence "should not be excluded 'if the government can prove that the evidence would have been obtained inevitably' without the constitutional violation." *United States v. Heath*, 455 F.3d 52, 55 (2d Cir. 2006) (quoting *Nix v. Williams*, 467 U.S. 431, 447 (1984)).

To successfully invoke this doctrine, the Government must prove by a preponderance of the evidence that, "viewing affairs as they existed at the instant before the unlawful search occurred, . . . a court can find, with a high level of confidence, that each of the contingencies necessary to the legal discovery of the contested evidence would be resolved in the government's favor." *United States v. Stokes*, 733 F.3d 438, 444 (2d Cir. 2013) (internal quotation marks and citations omitted). "Proof of inevitable discovery involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment." *Id.* (internal quotation marks and citations omitted).

Here, the Government argues that, "[i]rrespective of any unlawful entry" into the Residence, the police inevitably would have discovered and seized the Cellphone with lawful authority. Opp'n at 12. It further contends that law enforcement would have searched the seized Cellphone only after obtaining a warrant, which is what in fact happened. *Id.* Defendant counters that, because the Government is unable "to demonstrate the discovery was inevitable without extensive speculation," the evidence collected from the Cellphone must be suppressed. Reply ¶

10

10; *See also*, PH Reply at 7.

The Government relies on *United States v. Price*, 845 F. App'x 85 (2d Cir. 2021) (summary order) ("*Price II*"), to support its position. *See*, Opp'n at 12-14; PH Opp'n at 23-25. In that case, the defendant developed a relationship with a 16-year-old girl in Australia through social media and paid for her to run away from home and stay with him in New York. *United States v. Price*, 2017 WL 4838307, *1 (E.D.N.Y. Oct. 23, 2017) ("*Price I,*" and together with *Price II*, "*Price*"), *aff'd*, 845 F. App'x 85 (2d Cir. 2021). While searching for her, law enforcement officers went to the defendant's home and spoke with his mother, who denied that he was there. *Id.* However, officers stationed at the back of the house observed the defendant and girl attempting to leave, but they retreated inside upon seeing the officers. *Id.* The officers entered the house, arrested the defendant, and seized two telephones. *Id.* at *2. They did not have a search or an arrest warrant. *Id.* at *1.

The defendant moved to suppress evidence collected from the two phones on the basis that they were "fruit of the poisonous tree," as they were obtained during the officers' warrantless entry into the home and seizure of his person and the phones. *Id.* The district court denied the motion, finding that the phones inevitably would have been "lawfully obtained by a later-issued warrant." *Id.* at *6. It reasoned that because law enforcement officers had ample probable cause to believe the defendant committed the alleged crimes, as well as "reliable information that the phones contained evidence of crimes," the evidence "would have inevitably been uncovered as a result of independent investigation." *Id.* The Second Circuit affirmed, summarily finding that "the police would inevitably have discovered the phones, which were known to be central to the defendant's attempts to lure Doe to New York." *Price II*, 845 F. App'x at 86.

Here, the Government argues that, as in *Price*, the Cellphone inevitably would have been

11

discovered by law enforcement because it "was already 'known to be central' to the crime" allegedly committed by Defendant.  Opp'n at 14 (quoting *Price II*, 845 F. App'x at 86).  However, this argument implies that any evidence central to a crime will be admissible at trial once seized, even if seized unconstitutionally because law enforcement inevitably will discover any such evidence.  This is not and cannot be the case.  First, such a holding would eviscerate Forth Amendment protections and the exclusionary rule.  It would incentivize law enforcement officers to conduct warrantless searches and arrests whenever they suspect that a critical piece of evidence is within reach.  Second, it would be nonsensical to interpret *Price* as implying that the police *inevitably* will locate all evidence central to all crimes, thus making all such evidence admissible even when seized unconstitutionally.  Thus, the Court declines to adopt the Government's broad interpretation of *Price*.

Furthermore, *Price* is distinguishable from the instant matter.  In *Price*, the district court found exigent circumstances justified the officers' warrantless entry into the residence, where the phones were located.  *Price I*, 2017 WL 4838307 at \*4.  Such is not the case here.  *See*, Tr. 39:2-9.  Unlike in *Price*, the officers here had no lawful right to be in the Residence where the Cellphone was located.  Therefore, the Court cannot conclude that law enforcement inevitably would have located and seized the Cellphone but for the unlawful conduct.

Instead, the Court relies on well established Second Circuit precedent to determine whether to suppress evidence obtained from the Cellphone.  *See*, *Lauria*, 70 F.4th at 123 (citing *United States v. Whitehorn*, 829 F.2d 1225 (2d Cir. 1987), *United States v. Heath*, 455 F.3d 52 (2d Cir. 2006), and *In re 650 Fifth Ave. & Related Props.*, 830 F.3d 66 (2d Cir. 2016)); *See also*, *United States v. Guarino*, 578 Fed. App'x \*1, 2-3 (2d Cir. 2014) (summary order) (citing *U.S. v. Stokes*, 733 F.3d 438 (2d Cir. 2013), and *United States v. Cabassa*, 62 F.3d 470 (2d Cir. 1995)).  That

precedent requires the Court to analyze whether "each of the contingencies required for the discovery of the disputed evidence would in fact have occurred." *Heath*, 455 F.3d at 55. For example, in *Cabassa*, a district court denied a motion to suppress evidence seized during a warrantless search, holding that law enforcement inevitably would have "discovered [the evidence] by lawful means, namely a search warrant," even though no search warrant was in fact issued. 62 F.3d at 472. The Second Circuit reversed, finding that several contingencies may not have been resolved in the Government's favor, including that "the evidence might [have] disappear[ed] before issuance or execution of a warrant, or both." *Id.* at 474. The circuit rebuked the Government's argument that a warrant would have been issued "more probably than not" and therefore, the evidence would have been found, concluding that it was "susceptible to factual error," and "undermine[d] the conclusion that discovery of the evidence pursuant to a lawful search was inevitable." *Id.*

Similarly, in *Stokes*, a district court denied defendant's motion to suppress, holding that a gun located in an open bag, but hidden underneath a pair of pants, was admissible pursuant to the inevitable discovery doctrine, even though it was seized after officers unlawfully entered a defendant's motel room. 733 F.3d at 441, 444, 448. The Second Circuit reversed, reasoning that the district court overlooked "any number of contingencies" that could have prevented discovery. *Id.* at 446. For example, the defendant might have been arrested outside the room without guns, and his companion, whom police had no legal basis to stop, could have left the motel with the gym bag. *Id.* Alternatively, the defendant "might have zipped the bag and placed it in a closet before leaving the room." *Id.* at 447. The circuit cautioned that evidence only should be admitted pursuant to the inevitable discovery doctrine if a court has a "high level of confidence" that *all* contingencies would have been resolved in favor of the government. *Id.* at 444 (citing *Heath*, 455

13

F.3d at 60).

As the Second Circuit held in *Cabassa* and *Stokes*, the Court here holds that it is hardly inevitable that all contingencies necessary to the Cellphone's discovery would be resolved in favor of the Government but for the constitutional violation. In fact, several contingencies may have precluded discovery of the Cellphone. For example, in the hours between when Defendant awoke and an arrest warrant was executed, Defendant could have learned that Victim's remains were discovered and destroyed the Cellphone. Alternatively, if law enforcement attempted to arrest Defendant while he was home later in the day, after receiving an executed arrest warrant, Defendant might have been dressed and not needed to go into the room where the Cellphone was found, or the phone may have been in a different room. Defendant also might not have been at the Residence when the FBI attempted to arrest him with a warrant. If Defendant was arrested outside his home, he may not have had the Cellphone on his person. Additionally, Defendant's wife and young children were in the Residence at the time of the unlawful entry and any one of them could have taken the phone and disposed of it.

Moreover, there is no indication that the Government intended to apply for a warrant to search the Residence. This is an issue of "great importance," as "ultimate discovery would obviously be more likely if a warrant [wa]s actually obtained" to conduct a search that may have led to the discovery of the Cellphone. *Cabassa*, 62 F.3d at 473; *See also*, *Guarino*, 578 F. App'x at 3 (explaining that, even assuming they had probable cause, the Court could not determine that the police would have applied for a search warrant as "[they] had not begun to apply for such a warrant at the time of the illegal search"). In sum, the Court cannot find that there is "no doubt" that law enforcement would have located and seized the Cellphone had they not entered the Residence unlawfully. *Stokes*, 733 F.3d at 444 (internal quotation marks and citations omitted).

14

While it is true that "[a] court may only speculate about the likelihood" of any of the scenarios discussed above, "that is precisely the problem: a finding of 'inevitable' discovery cannot rest on speculation of what [Defendant] might or might not have done." *Id.* at 446. Indeed, the record before the Court "only demonstrate[s] that a . . . police officer *could have* [seized the Cellphone], not that a[n] . . . officer *would have* [seized the Cellphone]." *Id.* (citing *Heath*, 455 F.3d at 53).

The Government further argues that evidence obtained from the Cellphone is admissible because law enforcement agents searched the Cellphone in good faith pursuant to the Cellphone Warrant, which was obtained weeks after the unlawful arrest and seizure of the Cellphone. Opp'n at 16. However, this argument fundamentally misconstrues the good faith doctrine. The good faith doctrine was designed not to cure police misconduct, but to rectify situations where police reasonably relied on a warrant issued in error by a magistrate judge. *United States v. Leon*, 468 U.S. 897, 922, 104 (1984). Here, law enforcement did not have, and therefore could not have relied upon, any warrant. Instead, the initial taint is the police's unlawful entry into the Residence and unlawful seizure of his person and the Cellphone. It is black letter law that evidence derived from an unlawful search or seizure must be excluded as fruit of the poisonous tree. *Wong Sun v. United States*, 371 U.S. 471, 485–86 (1963). Accordingly, the Cellphone Warrant cannot cleanse the unlawful seizure and any evidence obtained from the Cellphone is inadmissible as fruit of the poisonous tree.

**B.      Post-Arrest Statements**

**1.      Alleged Fourth Amendment Violation**

Defendant also argues that the statements he made to the police during the post-arrest interrogation ("Statements") should be suppressed as fruit of the poisonous tree. *See*, Mot. at 7. However, "[w]here police have probable cause to arrest, the exclusionary rule does not bar the . . .

use of a statement made by the defendant outside his home, even though the statement is taken after an arrest made in the home in violation of *Payton*." *Harris*, 495 U.S. at 21 (reversing a lower court's decision to suppress statements made by a defendant during interrogation at a police station after he was arrested in his home without a warrant but with probable cause); *See also*, *United States v. Russell*, 501 F. App'x 67, 69 (2d Cir. 2012) (citations omitted). As discussed above, Defendant's arrest egregiously violated *Payton*. Therefore, the Court must determine whether the Government had probable cause to arrest Defendant before deciding whether the Statements may be admissible. *See*, PH Mem. at 18; PH Opp'n at 17-18.

Law enforcement officials have probable cause to arrest if, based on the totality of the circumstances, they have "sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense has been . . . committed by the person to be arrested." *United States v. Patrick*, 899 F.2d 161, 171 (2d Cir. 1990) (citations omitted). "The quantum of evidence required to establish probable cause to arrest need not reach the level of evidence necessary to support a conviction, but it must constitute more than rumor, suspicion, or even a 'strong reason to suspect.'" *United States v. Fisher*, 702 F.2d 372, 375 (2d Cir. 1983) (quoting *Henry v. United States*, 361 U.S. 98, 101 (1959)). When determining whether probable cause existed, the Court may consider only information known to law enforcement at the time of the arrest. *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) (internal citation omitted). Evidence gathered to establish probable cause may be circumstantial and can include, for example, witness statements, surveillance footage, electronically stored information, and text messages between coconspirators. *See*, *United States v. Lefebvre*, 117 F.4th 471 (2d Cir. 2024); *United States v. Walker*, 2023 WL 3451419, at *3 (2d Cir. May 15, 2023).

16

S/A Concannon testified that, during the investigation before Defendant's arrest, the Case Team gathered information from the following sources: (1) interviews with witnesses affiliated with Defendant, Coconspirator, and Victim; (2) location data from Defendant's, Coconspirator's, and Victim's cellular devices; (3) surveillance footage and license plate reader images of Defendant, Coconspirator, and Victim; (4) an interview with Coconspirator about his and Defendant's dealings with Victim; and (5) a search of Coconspirator's cellular device. *See*, Compl. ¶ 6; Tr. at 77:21-83:12; *See also*, Cellphone Warrant. Witnesses told law enforcement that Victim owed Defendant and Coconspirator $500,000 for luxury watches. Compl. ¶ 5. In the days before he disappeared, Defendant purportedly met with, "angrily demanded money" from, and threatened Victim. Compl. ¶¶ 5, 15; *See*, Tr. at 80:1-6 (S/A Concannon's testimony that Defendant and Coconpsirator "were saying if they didn't get their money that something bad could happen or he could be kidnapped."). Witness interviews and surveillance footage indicated that, on the last day Victim was seen alive, he gave Coconspirator at least $100,000 in cash, a check for additional funds, and signed a notarized statement purportedly transferring ownership of the Mercedes to Coconspirator. Compl. ¶¶ 6-8.

While searching Coconspirator's phone, law enforcement officers found communications between Defendant and Coconspirator regarding Victim, and saw that Coconspirator sent Defendant a photo of the document purportedly transferring ownership of the Mercedes as well as a video of "a large quantity of cash." Compl. ¶ 17; Aff, Supp. Cellphone Warrant, ¶¶ 19-20; Tr. at 86:8-19; 113:3-8. Witness statements and location data indicated that Defendant and Coconspirator followed a truck towing the Malibu to the Ellenville Property, where the FBI later found the Malibu and Victim's remains. Compl. ¶¶ 13, 18, 19; Tr. at 66:18-25. Taking the totality of the circumstances into consideration, the Court concludes that a person of reasonable caution

17

may, based on this information, believe that Defendant had committed some crime. The Court acknowledges that some of the facts relied upon by law enforcement here "might have been innocuous when considered in isolation," but that "does not disturb this Court's conclusion that the same facts, when considered together, establish probable cause" to arrest. *United States v. Brito*, 2025 WL 838708, at \*8 (E.D.N.Y. Mar. 18, 2025). Therefore, the Statements may not be suppressed as fruit of the poisonous tree, even though the officers' conduct violated *Payton*.

### 2.    Alleged Fifth Amendment Violation

Before commencing custodial interrogation of an individual who has been arrested, law enforcement must inform a defendant of her constitutional rights as set forth in *Miranda v. Arizona*, 384 U.S. 436, 467-68 (1966). However, a defendant may waive these rights "provided the waiver is made voluntarily, knowingly, and intelligently." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). *Colorado v.* Connelly, 479 U.S. 157, 168 (1986). Once an individual waives his *Miranda* rights, he may be questioned by law enforcement. *See*, U.S. Const. amend. V.

It is undisputed that Defendant was read his *Miranda* rights, and then waived those rights by signing an "Advice of Rights" form before the interrogation commenced. Nevertheless, Defendant argues that his Statements should be suppressed on two grounds. First, he contends that his waiver of rights was invalid because he was not provided with a translator, even though English is not his "first language." PH Mot. at 5, 18. He also asserts that that law enforcement violated his Fifth Amendment rights by "refus[ing] to cease interrogation despite the Defendant's repeated assertions of his right to remain silent." *Id.*

A waiver is "voluntary" if it "was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran*, 475 U.S. at 421. It was "knowing" if it was "made with a full awareness of both the nature of the right being abandoned and the consequences of the

18

decision to abandon it." *Id*. The Second Circuit has stated that "[w]hether a waiver is 'knowing and voluntary' is a question directed to a defendant's state of mind, which can be inferred from his actions and statements." *United States v. Spencer*, 995 F.2d 10, 11 (2d Cir. 1993) (per curiam). "When a suspect contends that a language barrier prevented him from comprehending his rights sufficiently to waive them knowingly, courts pay particular attention to whether the defendant was 'advised of his rights in a language that he understands' and to the 'defendant's conduct at the time the warnings are given.'" *United States v. Sultanov*, 742 F. Supp.3d 258 (E.D.N.Y. 2024) (citation omitted). In other words, a court must "make a case-by-case determination" as to whether the waiver was knowing and voluntary, "based on the totality of the circumstances[.]" *United States v. Gaines*, 295 F.3d 293, 298-99 (2d Cir. 2002) (citation omitted).

The Court finds that Defendant's waiver of his *Miranda* rights was knowing and voluntary. Defendant neither argues that he could not understand his *Miranda* rights, nor that he is unable to speak or understand English. *See*, PH Mot. at 5, 18 (stating only that English is not Defendant's "first" or "primary" language). Even so, "a lack of fluency in English does not preclude automatically a defendant from executing a knowing and voluntary waiver of rights in that language." *United States v. Ocasio*, 80 F. App'x 127, 129 (2d Cir. 2003) (summary order); *accord Campaneria v. Reid*, 891 F.2d 1014, 1020 (2d. Cir. 1989) ("Even though [the defendant's] proficiency in the English language may have been limited, it did not prevent him from making a knowing and intelligent waiver of his constitutional rights.").

Here, Defendant's conduct at the time that the warnings were given indicate that Defendant had no difficulty understanding his rights. When asked if he wanted to talk to law enforcement without a lawyer present, Defendant told the officers to, "[a]sk me the questions." Video at 0:02:53-0:02:58. All three Government witnesses testified that Defendant spoke and understood

19

English proficiently.  *See*, Tr. at 19:3-6 (S/A Sepe), 94:25-96:13, 148:9-12, 152:19-24, 154:7-14 (S/A Concannon), 181:16-22 (Supv. S/A Serkes).  This testimony is corroborated by the audio and video recording of the interrogation, which was conducted in English over approximately 90 minutes.  *See generally*, Video.  Based on the totality of these circumstances, the Court finds that Defendant knowingly and voluntarily waived his *Miranda* rights.

The Court also concludes that Defendant's Fifth Amendment right to remain silent was not violated during the interrogation.  While an individual may indicate "in any manner, at any time prior to or during questioning that he wishes to remain silent," that invocation "unambiguously" must indicate that the defendant wishes to end his interrogation.  *Miranda*, 384 U.S. at 444-45; *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010).  Otherwise, "police would be required to make difficult decisions about an accused's unclear intent and face the consequence of suppression 'if they guess wrong.'"  *Id.* (citation omitted).  If *Miranda* rights have been invoked unambiguously, "interrogation must stop and the invocation must be 'scrupulously honored.'"  *United States v. Gonzalez*, 764 F.3d 159, 165-66 (2d Cir. 2014) (*quoting Michigan v. Mosley*, 423 U.S. 96, 104 (1975)).  If the invocation is ambiguous, law enforcement may ask questions to clarify the defendant's request.  *Campaneria v. Reid*, 891 F.2d 1014  (2d Cir. 1989).

Defendant indicated on three occasions that he did not want to respond to questioning.  However, each of Defendant's purported invocations were ambiguous.  On the first two occasions, Defendant's invocations were ambiguous because they reasonably can be interpreted as indicating that he did not want to answer further questions about a particular topic, rather than that he wished to end questioning altogether.  *See*, Video at 0:30:23-0:30:34 ( "I don't know what's the story with him . . . I would like to stop here because I don't know what's with him going on."); Video at 0:42:55-0:43:14 ("I would like to stop all these questions on [unintelligible] . . . If somebody did

something, you're asking [about his] business[.]").  On the third occasion, Defendant stated that he did not "want to answer any questions," but then continued speaking to the officers, even when they reminded him that he could invoke his right to remain silent and end questioning.  *Id.* at 0:44:56-0:45:23.  In fact, Defendant expressly told the officers that he would continue responding to their questions.  *Id.* (in response to S/A Concannon's question, "Do you want to stop this, or can I show you one more photo?" Defendant stated, "You can show me the photo. It's no problem.").

It is well settled that a suspect cannot invoke his right to remain silent by refusing to respond to certain questions, but answering others.  *See*, United *States v. Ramirez*, 79 F.3d 298, 305 (2d Cir. 1996); *See also*, *United States v. Mir*, 224 F. Supp.3d 217, 219 (S.D.N.Y. 2016) (finding the defendant "implicitly waived [his right to remain silent] by continuing to answer the officers' questions").  Here, not only did Defendant fail to clearly invoke his right to remain silent, but he also continued speaking to S/A Concannon and CBP Officer Beck after indicating that he did not want to answer to certain questions.  Indeed, "the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afforded." *Berghuis*, 560 U.S. at 385.  "If [Defendant] wanted to remain silent, he could have said nothing in response to [the officers'] questions, or he could have unambiguously invoked his *Miranda* rights and ended the interrogation." *Id.* at 386.  Therefore, the Court finds that Defendant's Fifth Amendment rights were not violated and his motion to suppress the statements must be denied.

**IV.     Conclusion**

For the foregoing reasons, Defendant's motion is granted as to the evidence derived from his cellphone and denied as to his post-arrest statements, which are admissible.

SO ORDERED.

Dated: Brooklyn, New York
       March 7, 2026

/s/
_____
DORA L. IRIZARRY
United States District Judge
