UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
UNITED STATES OF AMERICA,　　　　　　:
　　　　　　　　　　　　　　　　　　　　　:　　　　**MEMORANDUM & ORDER**
　　　　　-against-　　　　　　　　　　　:　　　　　　**23-cr-99 (DLI)**
　　　　　　　　　　　　　　　　　　　　　:
SHLOMO PATCHIAV,　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　Defendant.　　　　　:
--------------------------------------------------------x

**DORA L. IRIZARRY, United States District Judge:**

Defendant Shlomo Patchiav ("Defendant") is charged by indictment with conspiracy to commit extortion in violation of 18 U.S.C. §§ 1951(a) and 3551. *See*, Indictment, Dkt. Entry No. 8. Defendant moved for a *Wade* hearing, arguing that the Government employed unduly suggestive identification procedures with respect to two identifications made by individuals interviewed by law enforcement. *See*, Def.'s Sept. 5, 2025 Letter Mot. ("Mot."), Dkt. Entry No. 100. The Government responded to the motion but did not oppose the request for a *Wade* hearing. *See*, Gov't's Oct. 3, 2025 Response Letter, Dkt. Entry No. 108. Defendant replied and addressed the timeliness of his motion. *See*, Def.'s Oct. 17, 2025 Reply Letter, Dkt. Entry No. 110.

A *Wade* hearing was held on November 4, 2025. After the hearing, Defendant filed a post-hearing brief and formally requested suppression of the identification evidence. *See*, Post-Hr'g Br. in Support of Mot. ("PH Br."), Dkt. Entry No. 114. The Government opposed. *See*, Post-Hr'g Opp'n Br. ("PH Opp'n"), Dkt. Entry No. 115. Defendant replied. *See*, Post-Hr'g Reply Br. ("PH Reply"), Dkt. Entry No. 118. For the reasons set forth below, Defendant's motion is denied.

**I.　　Findings of Credibility**

At the suppression hearing, the Government presented testimony from Vassyl Danyliouk, Natalia Hrytchuk, Federal Bureau of Investigation ("FBI") Special Agent Alan Fowler ("S/A

Fowler"), FBI Special Agent Joseph Loecher ("S/A Loecher"), and  New York City Police Department ("NYPD") and FBI Task Force Officer Alexander Kremer ("Officer Kremer").  The Court finds these witnesses credible.  Defendant neither testified nor called any witnesses in support of his motion.

## II.      Findings of Fact

The Court assumes the parties' familiarity with the background and procedural history of this case, which is set forth in detail in the Court's opinion on Defendant's first suppression motion, which is incorporated herein by reference.  *See*, Op. & Order Granting in Part Mot. to Supp. Evid., Dkt. Entry No. 121.  Accordingly, the Court includes only the findings of fact that are relevant for the disposition of the instant motion.

On June 25, 2022, an individual ("Victim") went missing from Brooklyn, New York. Compl. ¶ 3, Dkt. Entry No. 1.  The FBI formed a Case Team to investigate Victim's disappearance and potential kidnapping, which included S/A Fowler and S/A Loecher ("Case Team"), both of whom, at the time, served on the Eurasian Organized Crime Task Force.  *See*, Nov. 4, 2025 Hr'g Tr. ("Tr.") 103:13-17, 122:19-123:1.  The Case Team connected Victim's disappearance with a Chevrolet Malibu ("Malibu") early in the investigation.  *Id.* at 101:19-103:17.

### A.      Danyliouk's Identification of Defendant

On June 26, 2022, Defendant and his coconspirator ("Coconspirator") drove to a residence in Ellenville, New York (the "Ellenville Residence") in a white Jeep.  *Id*. at 15:11-16:10. Danyliouk, who owned and lived at the Ellenville Residence, had not met Defendant previously. *Id.* at 9:16-23, 45:1-4, 104:5-9.  However, Danyliouk had met Coconspirator when he helped install a door in an apartment his son owned in Brooklyn, New York that Coconspirator was renting at the time (the "Brooklyn Apartment").  *Id.* at 10:21-12:12, 77:7-78:3.

2

Defendant and Coconspirator came to the Ellenville Residence because Danyliouk told his son that Coconspirator could keep a car there. *Id.* at 13:3-24. Approximately five minutes after Defendant and Coconspirator arrived at the Ellenville Residence, a tow truck dropped off the Malibu. *Id.* at 21:2-23, 124:1-3. During those five minutes, Danyliouk had a clear view of Defendant and Coconspirator and conversed with them. *Id.* at 23:5-22. During the hearing, Danyliouk recalled that Defendant was a tall, skinny man who was wearing jeans but not wearing a hat. *Id.* at 20:11-13, 24:9-18.

After the tow truck dropped off the Malibu, Defendant and Coconspirator spent five to ten minutes unsuccessfully attempting to unlock its doors with a key. *Id.* at 25:7-26:10. Danyliouk was standing next to them, observed their attempts, and unsuccessfully tried to help. *Id.* at 26:8-27:7. Defendant and Coconspirator then spent approximately ten minutes unsuccessfully attempting to roll down the Malibu's window using duct tape that they borrowed from Danyliouk. *Id.* at 27:10-28:7. Danyliouk observed this effort. *Id.* 28:8:12.

Next, Coconspirator attempted to break one of the Malibu's windows using his fist and elbow for approximately five minutes. *Id.* at 28:17-25. When that did not work, Coconspirator looked for a rock that he could use and, finding none, borrowed a hammer from Danyliouk, which Coconspirator used to break a window. *Id.* at 29:6-30:10. It took Coconspirator five minutes to break the window, open the door, and collect certain documents from the glove compartment. *Id.* Coconspirator gave Defendant the documents. *Id.* at 30:16-17.

Coconspirator and Defendant then asked Danyliouk if they could purchase kosher meat and have a barbeque. *Id.* at 30:17-25. Danyliouk obliged and accompanied Defendant to three different grocery stores over approximately two hours looking for kosher meat. *Id.* at 31:18-34:9. Defendant drove from store to store while Danyliouk sat in the passenger seat. *Id.* He had a clear

view of Defendant and they engaged in casual conversation. *Id.* Coconspirator stayed behind at the Ellenville Residence, purportedly to rest. *Id.* at 31:2-8. Once Defendant and Danyliouk returned to the Ellenville Residence, Defendant asked Danyliouk if he could look around the property. *Id.* at 34:10-22. Defendant went to look at part of Danyliouk's property where there is a dump, returned to the house, and he and Coconspirator abruptly decided to leave. *Id.*

On July 1, 2022, the Case Team received information that the Malibu had been identified. *Id.* at 101:16-103:17. Within a few hours of receiving this information, the team located the Malibu at the Ellenville Residence. *Id.* Approximately five agents drove to the Ellenville Residence, where they believed that they might find Victim, Victim's body, or the suspected perpetrator. *Id.* at 103:19-23, 108:13-18. They came prepared to make an arrest and "were receiving information and intelligence in real time." *Id.* at 103:19-23, 113:15. It was "not feasible" "to prepare a traditional photo lineup and prepare to bring a witness into an office" between the identification of the Malibu and their arrival at the Ellenville Residence. *Id.* at 113:12-23.

When the agents arrived at the Ellenville Residence, they knocked on the door and spoke with Danyliouk in a combination of English and Russian for approximately ten to fifteen minutes. *Id.* at 47:11-15, 104:10-14, 109:6-10. Danyliouk explained that he allowed two men to leave the Malibu in his driveway as a favor to his son and recalled the events of June 22, 2022. *Id.* at 104:16-105:13, 107:13-108:1. Danyliouk recalled Coconspirator's name and that Defendant was Jewish, but did not give a physical description of either. *Id.* at 105:16-18, 109:14-17. An agent then showed Danyilouk two photos of Defendant and a photo of Coconspirator on his cellphone, and Danyliouk confirmed that the photographed individuals were the two men who left the Malibu at his house. *Id.* at 14:20-20:13; 106:3-111:25; *See,* GX 1, Photograph of Defendant; GX 2, Photograph of Defendant; GX 3, Photograph of Coconspirator.

4

On February 21, 2023, S/A Loecher accompanied other agents to interview Danyliouk again at the Ellenville Residence as part of the ongoing investigation into Victim's disappearance, potential kidnapping, and potential extortion. *Id.* at 122:22-123:10 ("Prior to the interview we [had] not f[ou]nd the [Victim]."). During this interview, Danyliouk again recalled the events of June 22, 2022, and described one of the men as "taller" and "lighter in complexion," and the other as "shorter" and "heavier built." *Id.* at 124:13-15. S/A Loecher showed Danyliouk a picture of Defendant, a picture of Coconspirator, and a picture of Victim. *Id.* at 124:16-126:8. Danyliouk recognized Defendant as the taller man who was at his house on June 22, 2022 and Coconspirator as the shorter man who also was there on that date. *Id.* He did not recognize Victim. *Id.* at 126:8.

### B.    Hrytchuk's Identification of Defendant

Hrytchuk moved into the Brooklyn Apartment on August 1, 2022. *Id.* at 77:15-78:3. When she moved into the Apartment, Danyliouk's son told her that the previous tenant would pick up some of the belongings he had left behind, including a bed, a TV set, a TV stand, and other items stored in garbage bags inside a closet. *Id.* at 79:5-81:3. Between September and October 2022, Defendant came to the Brooklyn Apartment on three occasions to collect the previous tenant's belongings. *Id.* at 81:4-82:9, 90:3-4. Hrytchuk recalled that Defendant was a "tall, skinny man [with] grayish hair." *Id.* Each time, he arrived between 8:00 P.M. and 10:00 P.M., while Hrytchuk was home and stayed for approximately one hour. *Id.* at 83:3-13. On each occasion, Hrytchuk greeted Defendant at the front door, spoke with him in Russian for one to two minutes, and walked him out. *Id.* at 83:14-85:13, 87:25-89:25.

She could see him clearly during those conversations. *Id. at* 84:1-6; 86:14-17. During the first visit, Hrytchuk observed Defendant collecting the trash bags containing the previous tenant's belongings from the closet. *Id.* at 85:16-86:8. On the second and third occasions, Hrytchuk

recognized Defendant as the same person who previously had visited her apartment to collect the prior tenant's belongings. *Id.* at 88:5-7, 89:15-17. On one of those occasions, two other men accompanied Defendant to help remove a bed. *Id*. at 81:17-20; *But see*, Tr. at 81:21-82:12 (stating that Defendant was alone on all three occasions).

On March 1, 2023, NYPD Officer Kremer, assigned to the FBI Task Force to investigate criminal enterprises, arrived at the Brooklyn Apartment and asked Hrytchuk about the previous tenant. *Id.* at 131:2-15. She stated that he no longer lived there and that three men of Eastern European origin arrived at night to remove the previous tenant's belongings. *Id.* at 131:16:20. S/A Kremer showed Hrytchuk a photograph of Defendant, who Hrytchuk identified as the man who had come to her apartment three times to collect the previous tenant's belongings. *Id*. at 90:15-22. He did not show her any other photographs. *Id.* at 132:6-7.

## III.    Legal Standard and Analysis

Courts follow a two-step test to determine whether identification evidence is admissible. *See*, *Neil v. Biggers*, 409 U.S. 188, 196-201 (1972); *Raheem v. Kelly*, 257 F.3d 122, 134 (2d Cir. 2001). First, the Court must ascertain whether the identification procedure used by law enforcement unnecessarily or unduly suggested that the defendant was the perpetrator, such that the suggestiveness of the procedure would deny the defendant due process of law. *Id.* An identification procedure may be unnecessarily suggestive if it is "based on police procedures that create a very substantial likelihood of irreparable misidentification." *Brisco v. Ercole*, 565 F.3d 80, 88 (2d Cir. 2009) (citation omitted). "[G]enerally[,] the practice of showing a witness a single photo (as opposed to an array) has been widely condemned as unduly suggestive." *United States v. Caille*, 2025 WL 1450806, at *3 (2d Cir. May 21, 2025) (citing *United States v. Diaz*, 986 F.3d 202, 207 (2d Cir. 2021)). However, courts may conclude that suggestive identification procedures

6

were necessary and, therefore, constitutional, if exigent circumstances justified the use of such a procedure. *United States v. Shodeinde*, 108 F.3d 1370 (2d Cir. 1997). Thus, identification evidence collected through a suggestive procedure, but under exigent circumstances would be admissible. *Id.*

Second, if an identification procedure was found to be unnecessarily suggestive, the identification evidence still would be admissible if the identification was independently reliable. *Id.* Indeed, "the linchpin in determining the admissibility of identification testimony is reliability." *Diaz*, 986 F.3d at 207 (internal quotation marks and citations omitted) (quoting *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977)). To determine whether identification evidence is independently reliable, courts employ the five-factor analysis set forth in *Biggers*. These factors are: (1) "the opportunity of the witness to view the criminal at the time of the crime"; (2) "the witness' degree of attention"; (3) "the accuracy of the witness' prior description of the criminal"; (4) "the level of certainty demonstrated by the witness at the confrontation"; and (5) "the length of time between the crime and the confrontation." *Biggers*, 409 U.S. at 199-200. No factor on its own is dispositive. *Id.* at 199; *Brisco*, 565 F.3d at 89 (citation omitted). Instead, courts must consider the totality of the circumstances to determine reliability. *Biggers*, 409 U.S. at 199-200.

### A.    Danyliouk's Identification of Defendant

Defendant argues that Danyliouk's identification should be suppressed because the Government's use of a single photograph during the identification procedure unduly suggested to Danyliouk that Defendant was the suspected criminal. PH Br. at 7. The Government counters that the single photograph procedure was justified due to the existence of exigent circumstances created by the recent kidnapping of Victim, the "ongoing threat" to Victim's life, and the fact that the suspected perpetrators were "still at large." PH Opp'n at 8. In turn, Defendant asserts that any

7

exigent circumstances dissipated once law enforcement realized that Danyliouk was not the suspect.  PH Reply at 5-6.

"The display of a single photograph does not necessarily require suppression of [an] identification, especially if the presence of exigent circumstances will justify the use of such a procedure." *United States v. Shodeinde*, 1997 WL 138701, at \*3 (2d Cir. March 21, 1997).  In *Shodeinde*, the Second Circuit affirmed then United States District Judge Sonia Sotomayor's conclusion that the use of a single photograph to make an identification was justified by exigent circumstances.  *Id.* \*3-4.  There, exigent circumstances existed because: (1) the officers sought photographic identification to corroborate the suspect's identity before arresting him; and (2) an agent testified that there was insufficient time to put together an array of photographs "in light of the danger that [the suspect] might flee or hide." *Id.*

Similarly, many courts have considered whether exigent circumstances could justify the use of "showup" procedures,[1] which, like single photograph identification procedures, are often found to be inherently suggestive.  The existence of exigent circumstances generally weighs against finding that a showup identification procedure was unduly suggestive, as such procedures may be necessary to confirm a suspect's identity or to release an innocent suspect quickly.  *See*, *Brisco*, 565 F.3d at 88-89.  In such cases, "identification evidence from showups held in close temporal and geographic proximity to the crime scene may be admitted." *Id.* at 89; *See also*, *Gilford v. Racette*, 2015 WL 4639975, at \*16 (S.D.N.Y. Aug. 5, 2015) (collecting cases).

Here, the single photograph identification procedure that law enforcement used while interviewing Danyliouk was suggestive, but not unnecessarily so, because existent circumstances

---

[1] A "showup" procedure "involves the presentation of a single suspect to a witness by the police (as opposed to a lineup, in which several individuals are presented to the police, only one of whom is the suspect)." *Brisco*, 565 F.3d at 88 (citing *Simmons v. United States*, 390 U.S. 377, 394 (1968)).  Such procedures are "widely condemned" as unnecessarily suggestive. *Id.* (citing *Stovall v. Denno*, 388 U.S. 293, 302 (1967)).

justified the procedure. The law enforcement officers actively were investigating a potential kidnapping and searching for a missing person whom they feared might be injured or dead. *See,* Tr. at 103:13-17. S/A Fowler testified that he and approximately four colleagues drove to Ellenville to interview Danyliouk within an hour of determining that the Malibu, which was associated with the potential kidnapping, was found at the Ellenville Residence. *Id.* at 101:16-104:7, 108:13-18, 113:16-18. The Government had not apprehended any suspect yet. S/A Fowler testified that he "didn't know going up there if [Danyliouk] was the subject or a witness," or "if [they] were going to find a kidnapped person, a deceased person, [or] a resistant subject at that house." *Id.* at 113:10-114:6. He also testified that there was insufficient time "to prepare a traditional photo lineup and prepare to bring a witness into an office." *Id.* Therefore, the Court concludes that the identification procedure used was justified by exigent circumstances as it took place during an ongoing search for a missing person at a location where the officers credibly believed that person might be found and within hours of the discovery of that location. *See, Brisco,* 565 F.3d at 86, 90 (affirming New York Court of Appeals ruling that exigent circumstances existed when identification procedure took place "within an hour of the commission of the crime, and in the context of a continuous, ongoing investigation."). Accordingly, this identification evidence is admissible.

Defendant's argument that any exigent circumstances ceased to exist once law enforcement discovered that Danyliouk was not the suspect is meritless. As the Government correctly states, "[t]he agents' elimination of Danyliouk as a suspect did not instantaneously extinguish the exigency of the circumstances" surrounding the interview. PH Opp'n at 9 n.3. At the time of the interview, the suspects remained at large, and law enforcement were actively investigating a potential kidnapping of a missing person who they credibly suspected was brought to Danyliouk's

property.  Those circumstances did not disappear upon finding that Danyliouk was not a suspect.

Even if the Court had found that exigent circumstances could not justify the suggestive identification procedure, Danyliouk's identification would be admissible because it is independently reliable.  Of the five *Biggers* factors, four weigh in favor of admissibility, and the fifth is inapplicable.  First, Danyliouk had ample opportunity to observe Defendant.  He testified that he stood next to, and had a "clear view" of, Defendant for approximately thirty minutes while he and Coconspirator tried to break into the locked Malibu.  *See*, Tr. at 26:33, 27:7, 29:2; *See also*, Tr. at 28:12 ("I could see them real well, like 100 percent.").  He then testified that he spent approximately two hours alone with Defendant driving to various grocery stores in search of kosher meat.  *Id.* at 30:17-33:25.  Danyliouk stated that, while in the car, he was seated in the front passenger seat next to Defendant, who was driving, and accompanied Defendant into the various grocery stores.  *Id.* at 31:14-34:9.  He added that he had a "clear" and "very good" view of Defendant and could see him "100 percent" throughout this entire period.  *Id.*  Therefore, the first *Biggers* factor plainly weighs in favor of admissibility.  *See*, *United States v. Wong*, 40 F.3d 1347, 1360 (2d Cir. 1994) (holding that two to three seconds-long observations of defendant was sufficient for reliable identification); *Mitchell v. Lempke*, 2010 WL 3937306, at *7 (E.D.N.Y. Oct. 4, 2010) (holding that a witness had sufficient opportunity to observe the defendant because she saw him when he entered her apartment building, as she waited for the elevator, and while she was alone with him in the elevator).

So too does the second factor, which concerns the witness' "degree of attention."  Danyliouk recalled specific details of his interactions with Defendant, despite the passing of three years between this interaction and providing testimony at the *Wade* hearing.  He recalled that Defendant was wearing blue jeans, not wearing a hat, and drove a white Jeep.  Tr. at 15:15-16:7,

10

24:9-18.  He also recalled the details of his conversations with Defendant and Coconspirator, the various ways that Defendant and Coconspirator attempted to unlock or otherwise get into the Malibu, and the particular grocery stores he visited with Defendant.  *Id.* 22:3-5, 24:20-30:18. Further, he clearly recalled the details of his conversations with Defendant and Coconspirator, and Defendant's conversation with an employee at one of the stores.  *Id.* 31:18-33:20.  Danyliouk's ability to recall with great specificity details regarding Defendant and Coconspirator, as well as his interactions with them, indicate that he was paying close attention throughout this prolonged period of time he spent in their proximity in what was a most unusual encounter.  *See*, *Montes v. Smith*, 2026 WL 88979, at *6 (N.D.N.Y. Jan. 13, 2026) (finding one witness paid sufficient attention to the defendant because she engaged in two face-to-face interactions with him while procuring a bank account, as did another who had a five to ten minute conversation with the defendant inside the defendant's vehicle); *Berry v. Cunningham*, 2012 WL 4174875, *6 (E.D.N.Y. Sept. 19, 2012) (finding the witness was "focused and attentive" because he "testified to his specific observations and had the presence of mind" to notice particular details).

This is unsurprising, given the strangeness and suspiciousness of Danyliouk's interactions with Defendant and Coconspirator.  As a favor to his son, Danyliouk allowed strangers to come to his home, tow a second car to his home, and leave that second car there for some time.  The men could not open that car, tried various attempts to break into it, and succeeded only by smashing in a window with a hammer that Danyliouk provided.  Then, they asked him to have a barbecue at his house.  Coconspirator purportedly took a nap in Danyliouk's home while Danyliouk and Defendant searched for kosher meat.  When they finally acquired the meat and returned, the men abruptly changed their minds and left without eating.  Any one aspect of these interactions would be "likely to attract [Danyliouk's] attention." *Brisco*, 565 F.3d 80 at 92.  Thus, this factor heavily

11

militates towards admissibility.

The third factor is inapplicable, as there is no evidence that Danyliouk described Defendant prior to the identification. *See*, PH Opp'n at 12. The fourth *Biggers* factor, namely the witness' level of certainty in his identification, weighs in favor of admissibility. Danyliouk testified that he was "100 percent" confident that Defendant was the person in the photograph that law enforcement showed to him. *See*, Tr. at 36:3-21.

Finally, the fifth *Biggers* factor, the length of time between the initial observation and the identification, also supports admissibility. Danyliouk identified Defendant as the person in the photograph shown by law enforcement five days after interacting with him. *See*, *Frazier v. New York*, 187 F. Supp. 2d 102, 112 (S.D.N.Y. 2002) (finding nine days was not "unduly lengthy"), *aff'd*, 156 F. App'x 423 (2d Cir. 2005); *Mitchell*, 2010 WL 3937306, at *7 (finding a two day lapse was not unduly lengthy). Given the totality of the circumstances, the Court concludes that Danyliouk's identification was independently reliable and therefore would be admissible even if it had been unnecessarily suggestive. *See*, *Bilbrew v. Garvin*, 2001 WL 91620, at *7 (E.D.N.Y. Jan. 10, 2001) (collecting cases) ("Not all of [the *Biggers*] factors need to weigh in favor of the government in order for a challenged identification to be admissible."). Wherefore, Danyliouk's identification of Defendant is admissible.

## B. Hrytchuk's Identification of Defendant

The Government concedes that the identification procedures employed by the officers during Hrytchuk's interview were unduly suggestive as exigent circumstances did not exist at that time. *See*, PH Opp'n at 13. The Government nonetheless contends that Hrytchuk's identification of Defendant is admissible because it is independently reliable. *Id.* The Court concurs.

12

First, Hrytchuk had clear opportunities to observe Defendant.  He arrived at her apartment on three occasions, where she greeted him, spoke with him for "up to one minute" and let him inside to collect the previous tenants' belongings.  Tr. 82:2-90:8.  Although he always arrived at night, a light was on by the front door when she greeted and spoke with him.  *Id.* 84:4-6.  Defendant stayed in Hryutchuk's apartment for "up to one hour" on each occasion and she viewed him collecting things from her closet.  *Id.* 83:11-13, 85:22-86:10.  Hryutchuk testified that, before Defendant left her apartment on the first two occasions, he told her that he would be returning for the remaining belongings and she walked him out.  *Id.* 86:11-88:19.  Given Hryutchuk's opportunities to view and observe Defendant, the first *Biggers* factor weighs in favor of admissibility.  *See*, *United States v. Argentina*, 173 F. App'x 90, 94 (2d Cir. 2006) (collecting cases) ("Even brief glimpses and short conversations may support a finding of independent reliability of an identification.").

The second factor, "degree of attention," also supports a finding of admissibility.  Indeed, "viewing an uninvited stranger [inside] one's house is likely to attract close attention."  *Brisco*, 565 F.3d at 92.  Hrytchuk accurately, albeit generally, described Defendant's appearance and recalled specific details about the conversations she had with him when he arrived to collect Coconspirator's belongings.  Tr. 81:7-8, 83:14-89:25.  Her ability to recall these details indicates that she paid close attention to the stranger rummaging through her apartment at night.  Similarly, the fourth factor militates in favor of admissibility.  Hrytchuk testified that she "was 100 percent confident" that the person in the photograph shown to her by the officers was the person who had entered her apartment on three occasions to collect the prior tenant's possessions.  *Id.* 90:12-91:2.

However, the third factor is neutral, and the fifth factor weighs against admissibility.  While Hrytchuk's description of Defendant as an Eastern European man is consistent with his

13

appearance, it is generic and also was used to describe the two other men who accompanied Defendant to remove the bed from the Brooklyn Apartment. Moreover, approximately five months had elapsed between Hrytchuk's encounters with Defendant and her identification of him. *See*, PH Opp'n at 14-15 (conceding that this factor weighs against admissibility); S*ee also*, *Biggers*, 409 U.S. at 201 (concluding that a seven-month lapse between the crime and the confrontation "would be a seriously negative factor in most cases"); *Raheem*, 257 F.3d at 138 ("[T]he time between the crime and the lineup—less than three weeks—was not great.").

Nevertheless, considering the totality of the circumstances, the Court finds that Hrytchuk's identification of Defendant was reliable despite the suggestive nature of the single photo identification procedure. *See*, *United States v. Woodford*, 2019 WL 5457854, *9 (E.D.N.Y. Oct. 23, 2019) (collecting cases) ("[C]ourts have found witnesses sufficiently familiar with a suspect to render an independently reliable identification after a single minutes-long interaction, notable interactions, or conversations, and even after a year-long interval or longer."); *Jenkins v. Cook*, 2015 WL 1886775, at *11 (E.D.N.Y. Apr. 24, 2015) ("The third and fifth *Biggers* factors are not here indicators of reliability, but the other factors make the state court's finding of independent reliability reasonable.").

## IV.    Conclusion

For the foregoing reasons, Defendant's motion to suppress identification testimony is denied in its entirety.

SO ORDERED.

Dated: Brooklyn, New York
       March 7, 2026

                                            /s/
                                  _____
                                        DORA L. IRIZARRY
                                   United States District Judge

14